NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11849


COMMONWEALTH  vs.  ADMILSON RESENDE.



Plymouth.      December 10, 2015. - June 9, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.


Firearms.  Practice, Criminal, Motion to suppress, Sentence.



Indictments found and returned in the Superior Court
Department on August 26, 2011.

Pretrial motions to suppress evidence were heard by Charles
J. Hely, J., and a motion for reconsideration was considered by
him; and the cases were heard by Frank M. Gaziano, J.

The Supreme Judicial Court granted an application for
direct appellate review.


Patrick Levin, Committee for Public Counsel Services, for
the defendant.
Carolyn A. Burbine, Assistant District Attorney, for the
Commonwealth.


BOTSFORD, J.  In a jury-waived trial in June, 2014, a

Superior Court judge found the defendant, Admilson Resende,

guilty of several firearms offenses, each of which had

associated with it an armed career criminal sentence enhancement charge under G. L. c. 269, § 10G (§ 10G), the Massachusetts armed career criminal act (Massachusetts ACCA). After a separate jury-waived trial on the enhancement charges, the judge sentenced the defendant under § 10G (c) to a mandatory minimum State prison term of from fifteen years to fifteen years and one day. In his appeal from these convictions, the defendant presents an unanswered question about the proper interpretation of § 10G, which provides sentence enhancements for designated firearms offenses where a defendant previously has been convicted of one or more "violent crimes" or "serious drug offenses," or a combination of the two. For reasons we shall explain, we interpret § 10G to mean that where the previous convictions of predicate offenses forming the basis of the sentence enhancement charge were all part of a single prosecution, they properly should be treated as a single predicate conviction. In this case, therefore, the defendant's previous drug offense convictions, which were part of a single prosecution, should have been considered as one previous conviction that would be punishable under § 10G (a) rather than § 10G (c).[1]

---

[1] In addition to his claim concerning the sentence imposed under G. L. c. 269, § 10G (§ 10G), the defendant challenges the denial of his pretrial motions to suppress evidence. We

1.  Background.  a.  <u>Prior drug convictions</u>.  On August 22, 2006, when the defendant was nineteen years old, he was arrested and charged with five counts of distribution of cocaine and one count of possession of cocaine with intent to distribute, G. L. c. 94C, § 32A (<u>a</u>).  The five distribution counts arose from hand-to-hand transactions that took place on five different days within a seventeen-day period from August 5 through August 22, 2006; the possession with intent count arose from the defendant's actions on August 22, 2006.  All of the counts were included in a single set of charges.  On January 23, 2007, the defendant pleaded guilty to the distribution charges as part of a single plea proceeding, and received concurrent house of correction sentences.[2]

b.  <u>Convictions at issue in this appeal</u>.  i.  <u>Procedural history</u>.  On August 26, 2011, a grand jury returned indictments against the defendant for unlawful possession of a firearm, G. L. c. 269, § 10 (<u>a</u>); unlawful possession of a loaded firearm, G. L. c. 269, § 10 (<u>n</u>); unlawful possession of a firearm or ammunition without a firearm identification card, G. L. c. 269, § 10 (<u>h</u>); and unlawful possession of cocaine with intent to distribute, subsequent offense, G. L. c. 94C, § 32A (<u>c</u>) and (<u>d</u>).

---

conclude in this opinion that the defendant's motions to suppress were properly denied.

[2] The possession with intent charge was placed on file.

Each of the firearms offenses carried a concomitant sentence enhancement charge under § 10G. On May 7, 2012, the defendant filed motions to suppress the physical evidence seized by the police and his postarrest statements. After an evidentiary hearing, a Superior Court judge (motion judge) denied the motions on December 4, 2012. On June 30, 2014, at the conclusion of a bench trial on all charges other than the sentence enhancement charges, a different Superior Court judge (trial judge) found the defendant guilty of unlawful possession of a firearm, unlawful possession of a loaded firearm, and unlawful possession of a firearm or ammunition without a firearm identification card; he found the defendant not guilty of possession of cocaine with intent to distribute. Thereafter, the trial judge in a separate bench trial found the defendant guilty of two of the armed career criminal sentence enhancement charges as a person previously convicted of three or more serious drug offenses, and imposed the mandatory minimum sentence.[3,4]

---

[3] The defendant's conviction of unlawful possession of a loaded firearm and the accompanying armed career criminal charge were dismissed by agreement.

[4] At the conclusion of the trial on the sentence enhancement charges, the trial judge denied the defendant's request for a required finding that each of the previous drug charges did not constitute a separate predicate offense under the Massachusetts armed career criminal act (ACCA).

ii. <u>Facts</u>.[5] On May 28, 2011, State police Trooper Erik Telford was on patrol in Brockton with Sergeant Michael McCarthy. Telford had substantial experience working as a member of law enforcement units focused on individuals involved in guns, violence, and drugs in urban areas, and he had worked specifically in Brockton and with the Brockton police. At approximately 11:40 P.M., Telford and McCarthy, driving in an unmarked police vehicle, were near the intersection of Ames and Intervale Streets, where, on one corner, a bar was located. The neighborhood was an area where Telford had been assigned to work since 2003, and he had made numerous arrests for gun offenses as well as drug offenses in this area. Telford saw a young man, the defendant, walking with two women on the opposite side of Intervale Street, and believed that the defendant made eye contact with him. The defendant was wearing a long polyester jacket that extended past his hips and covered his pants pockets. Telford noticed the jacket because it was not a particularly cold night and Telford himself was not wearing a jacket. Telford saw the defendant move his hand under the jacket and into the waistband area underneath his shirt, and

---

[5] The facts are taken primarily from the findings made by the motion judge in ruling on the defendant's motions to suppress; the judge's findings are themselves based primarily on the testimony of Trooper Erik Telford and Sergeant Michael McCarthy of the State police, witnesses whom the motion judge found to be "highly credible."

became suspicious that the defendant was carrying a gun. Telford also believed that the defendant appeared similar to a man depicted in a bulletin that had been posted at various locations in the Brockton police station.[6]

Telford turned his vehicle around, "and waited in the vicinity of the [bar]." As he did so, the defendant and the two women walked through the bar's parking lot toward the front door of the bar.[7] Telford and McCarthy left their vehicle and approached the defendant, while wearing clothing marked "State Police," with their badges and guns clearly visible. As he approached, Telford noticed that the defendant had his right hand out of his pocket and at his waist area. Telford asked the

---

[6] On or about May 25, 2011, Brockton police Officer Robert Saquet posted bulletins containing a photograph of a young African-American man holding a "TEC-9" automatic pistol in the Brockton police station detectives' office and the report room, where uniformed officers write their reports; the name of the man depicted in the photograph was not provided. Trooper Erik Telford had seen one of the bulletins while in the Brockton police station within a few days of May 28, 2011. Although at some point the Brockton police learned the name of the person depicted, who was not the defendant, and added the name to the bulletin, the original version viewed by Telford had not had a name added to it.

The motion judge found that the defendant shared similar basic characteristics with the man in the bulletin, including height, approximate age, facial hair, and wearing of a baseball cap, and noted that these similarities could apply to many men in the Brockton area.

[7] The motion judge did not make any finding about precisely when the two police officers drove into the bar parking lot itself, or about where the officers parked their vehicle in relation to the entrance to the bar.

defendant his name, and the defendant gave his correct name in response.  Telford then remembered that he had encountered the defendant in connection with a search of a residence pursuant to a warrant -- a search that had resulted in the discovery of two guns.  At this point, Ryan Guinta, a bouncer at the bar, came out of the bar and told the officers that the defendant had been in the bar all night.  Telford knew that this was not true, and told Guinta to go back inside, which he did.

Telford motioned to the defendant to follow him to a different part of the parking lot where they could speak further.  As the defendant walked to this location, Telford noticed that the defendant had his right hand in his pocket but was holding it close to his body at the waistband area, and that the defendant "bladed away" from him.[8]  During the ensuing conversation, the defendant, with his right hand in his pocket, made movements that appeared to Telford to be retention checks -- touching the area where a weapon or heavy object is located to ensure it stays in place because it is not holstered.  Telford recognized these types of movements as being consistent with someone who is carrying a weapon in his waistband.  Telford asked the defendant to remove his right hand from his pocket,

---

[8] Telford testified that "blading away" refers to the action of creating a thin profile of oneself with respect to another viewpoint, effectively hiding one side of the body from the other person's view.

which the defendant did briefly, before putting it back into the pocket. Telford asked the defendant again to remove his right hand from his pocket, which he did, and then the defendant touched an area near his waistband, consistent with another retention check. After noticing that the defendant was looking from left to right, as if to attempt to flee, Telford asked him to lift his shirt, twice. The defendant did so, but both times exposed only the left side of his waistband, where Telford saw nothing. At this point, because the officers were convinced that the defendant was carrying a gun, they decided to handcuff him, but before the handcuffs were applied, Telford reached to the right side of the defendant's waistband and retrieved a gun containing one round of ammunition in the chamber and at least one other round in the gun magazine. The officers arrested the defendant for unlawfully carrying a firearm and advised him of the Miranda rights. After stating that he understood his rights, the defendant said that he had obtained the gun in Providence, Rhode Island, the cost was $750, the gun was not stolen, and it had serial numbers. In a subsequent search of the defendant incident to his arrest, the officers found plastic bags containing cocaine and, when asked if the bags contained more than fourteen grams, the defendant responded that they did not.

2. Discussion. a. Motions to suppress. On review of a ruling on a motion to suppress, "we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law'" (citation omitted). Commonwealth v. Scott, 440 Mass. 642, 646 (2004). We "make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found" (citation omitted). Id.

The defendant argues that the denial of his motions to suppress was error because he was seized without reasonable suspicion -- a contention turning primarily on the propriety of the motion judge's ruling that no seizure of the defendant occurred at least until the defendant was directed to go speak with Trooper Telford in a different area of the parking lot from where the officers first encountered him. The defendant contends that this ruling was incorrect because, contrary to the motion judge's findings, the uncontradicted testimony of Telford showed that as the defendant approached the front door of the bar, the officers "cut off [the defendant's] path of travel and immediately got out of their car and approached him" with their guns and badges displayed. In doing so, the defendant argues, the officers effectuated a seizure of his person at that point, because a reasonable person would not have felt free to leave under those circumstances. The defendant contends further that,

at this point in time, the officers did not have a reasonable suspicion of any criminal activity, and accordingly, all of the officers' actions that followed, culminating in the defendant's arrest, were constitutionally prohibited and his motions to suppress should have been allowed. The Commonwealth argues that the motion judge correctly concluded that there was no seizure of the defendant until he was directed to a different area of the parking lot, at which time the officers had a reasonable suspicion that the defendant was illegally carrying a gun, and their subsequent, measured actions fit well within the scope of a permissible stop, frisk, and seizure pursuant to Terry v. Ohio, 392 U.S. 1 (1968). We agree with the Commonwealth.

We reject the defendant's challenge to the motion judge's factual findings. As previously stated, the judge did not make a specific finding as to when the two officers drove into the parking lot,[9] but insofar as the findings may suggest that the officers entered the parking lot and came to a stop before the defendant and his two companions reached the bar's door and at a distance that permitted them to do so, the testimony of Sergeant McCarthy supports that view.[10] Accordingly, we do not agree with

---

[9] See note 7, supra, and accompanying text.

[10] McCarthy testified that "when [he] pulled into the parking lot with Trooper Telford, . . . the defendant and the two females continue[d] to walk towards the entrance of the [bar]."

the defendant that the judge made clearly erroneous findings concerning the initial encounter between the defendant and the two officers. Rather, our review of the motion record persuades us that the judge was warranted in concluding that the officers' exit from their vehicle with their State police identification and weapons visible, followed by Telford's question asking the defendant for his name, was not itself a stop or seizure in the constitutional sense. See, e.g., Commonwealth v. Narcisse, 457 Mass. 1, 5-6 (2010) (no seizure where officers pulled alongside defendant and got out of vehicle, asking defendant's name and what he was doing in vicinity); Commonwealth v. Gomes, 453 Mass. 506, 510 (2009) (defendant not seized when police got out of vehicles quickly and approached him as he stood in doorway; no indication that police activated blue lights); Commonwealth v. Lopez, 451 Mass. 608, 610-614 (2008) (two uniformed officers in two marked patrol cruisers followed defendant on bicycle late at night; one officer emerged from cruiser, and asked, "Can I speak with you?" after which defendant approached him; officer's actions did not constitute seizure); Commonwealth v. DePeiza, 449 Mass. 367, 370-371 (2007) (no seizure where police got out of unmarked vehicle and approached defendant, while engaging in brief conversation).

The motion judge determined that a limited "intrusion" -- i.e., seizure -- occurred when Telford requested or directed the

defendant to walk to a different part of the parking lot to talk to the trooper, and that this seizure was justified in the circumstances. We agree. By that point, Telford had observed the defendant holding his hand at his waist in a manner that Telford believed from his training and experience was consistent with someone holding a gun in the waistband of his pants. Moreover, before speaking with the defendant at the new location in the parking lot, Telford had observed the defendant "blading" away from him and making motions with his hand that were consistent with weapon retention checks. We also agree with the motion judge that Telford's series of increasingly intrusive actions that followed -- asking the defendant to take his hands out of his pocket, then asking the defendant to raise his shirt, then reaching for the defendant's hands and putting them behind his back, and then grabbing a gun from the defendant's waist area on his right side -- were all reasonable responses to new information supplied by the defendant's actions that provided an increasingly robust basis for suspecting the defendant was holding a concealed gun in his pants on the right side of his body. The seizure of the defendant effectuated by Telford and McCarthy was constitutionally proper. See DePeiza, 449 Mass. at 371. Cf. Commonwealth v. Torres, 433 Mass. 669, 675 (2001) (officer's actions no more intrusive than necessary at each

phase of increasingly suspicious interaction with defendant and passengers in vehicle during traffic stop).

b. Defendant's armed career criminal status. The defendant argues that his armed career criminal convictions cannot stand because his five previous drug convictions were encompassed in a single prosecution. As such, he claims, the convictions should be counted as a single predicate offense for purposes of § 10G, and therefore within the scope of level one, see § 10G (a), rather than level three, see § 10G (c). The Commonwealth takes the position that, under § 10G, similar to the enhancement scheme under 18 U.S.C. § 924(e) (2006), the Federal armed career criminal act (Federal ACCA), each qualifying violent crime or serious drug offense of which a defendant has previously been convicted represents a separate predicate offense for purposes of determining sentence enhancement levels, regardless of whether those previous convictions were the result of a single or several prosecutions. Although this court has considered questions concerning the proper interpretation of § 10G in prior cases,[11] the issue raised here is one of first impression.

---

[11] See, e.g., Commonwealth v. Eberhart, 461 Mass. 809 (2012); Commonwealth v. Anderson, 461 Mass. 616, cert. denied, 133 S. Ct. 433 (2012); Commonwealth v. Johnson, 461 Mass. 44 (2011); Commonwealth v. Furr, 454 Mass. 101 (2009). The Appeals Court has as well. See, e.g., Commonwealth v. Colon, 81 Mass.

Section 10G provides in relevant part:

"(a) Whoever, having been previously convicted of a violent crime or of a serious drug offense, both as defined herein, violates the provisions of paragraph (a), (c) or (h) of [§] 10 shall be punished by imprisonment in the state prison for not less than three years nor more than [fifteen] years.

"(b) Whoever, having been previously convicted of two violent crimes, or two serious drug offenses or one violent crime and one serious drug offense, arising from separate incidences, violates the provisions of said paragraph (a), (c) or (h) of said [§] 10 shall be punished by imprisonment in the state prison for not less than ten years nor more than [fifteen] years.

"(c) Whoever, having been previously convicted of three violent crimes or three serious drug offenses, or any combination thereof totaling three, arising from separate incidences, violates the provisions of said paragraph (a), (c) or (h) of said [§] 10 shall be punished by imprisonment in the state prison for not less than [fifteen] years nor more than [twenty] years." (Emphasis added.)

G. L. c. 269, § 10G (a)-(c).[12]

The question of interpretation before us relates to the meaning of the phrase, "having been previously convicted of three [qualifying crimes] arising from separate incidences," that appears in § 10G (c), and more specifically the meaning of

_____

App. Ct. 8, 12 (2011); Commonwealth v. Ware, 75 Mass. App. Ct. 220, 222 (2009).

[12] Under § 10G (d), any sentence imposed under the statute shall not be reduced to less than the minimum mandatory sentence or suspended, and the defendant is not eligible for probation or parole until he has served the minimum term.

the phrase, "arising from separate incidences."[13]  To answer that question, we consider first the meaning of the actual language used by the Legislature.  See Commonwealth v. Robertson, 467 Mass. 371, 376 (2014).  However, "we also seek guidance from [the statute's] legislative history, . . . the language and construction of related statutes, . . . and the law of other jurisdictions" (citations omitted).  Commonwealth v. Welch, 444 Mass. 80, 85 (2005).

The word "incidences" or "incidence" is not defined in § 10G.  Dictionary definitions of "incidence" include "an act or the fact or manner of falling upon or affecting:  occurrence," the "rate, range, or amount of occurrence or influence," Webster's Third New International Dictionary 1142 (1993), and "[t]he frequency with which something occurs, such as crime" or "the number of times that something happens," Black's Law Dictionary 879 (10th ed. 2014).  The word thus appears to focus more on the measurement of something's frequency of occurrence than on the definition of the "something" itself.  In that sense, it is distinct from the word "incidents," or "incident."[14]

---

[13] At issue in this case are the defendant's convictions under § 10G (c), but our analysis applies with equal force to § 10G (b).

[14] The word "incident" is defined as "a separate unit of experience:  happening," Webster's Third New International Dictionary 1142 (1993), and "[a] discrete occurrence or

But the fact that the Legislature chose not to use the word "incidents" provides little direct guidance as to what the Legislature meant by selecting "incidences."  Nor is the statute's legislative history illuminating on this point. Section 10G was enacted in 1998 as one section of an omnibus piece of legislation entitled, "An Act relative to gun control in the Commonwealth," that was designed to provide a stricter gun control regime by adding a wide variety of new statutory provisions.[15]  It appears that from the earliest drafts, the phrase "arising from separate incidences" was included in what is now § 10G, and nothing in these drafts or any other legislative materials available for review offers any explanation or guidance as to the reason for this choice of

---

happening; an event, esp. one that is unusual, important, or violent," Black's Law Dictionary 879 (10th ed. 2014).

[15] Section 10G was inserted by St. 1998, c. 180, which, among other things, enacted into Massachusetts law the Federal assault weapons ban; created negligence liability for gun owners who improperly stored guns; created a new category of large capacity weapons, see G. L. c. 140, § 121, and G. L. c. 269, § 10F; created a new licensing structure for all guns, see G. L. c. 140 § 123; established a firearms record-keeping trust fund; prohibited the possession or sale of "sawed-off" shotguns, see G. L. c. 269, § 10 (c); required that gun dealers operate out of a location separate from their residence; prohibited mail order gun sales within the State, G. L. c. 140, § 123; established penalties for possession of a weapon while intoxicated, G. L. c. 269, § 10H; and required all new gun license applicants to pass a gun safety course, G. L. c. 140, § 131P.

words, or the meaning that the Legislature ascribed to them.[16]

However, three separate considerations lead us to conclude that

the phrase "arising from separate incidences" is best understood

to mean that each previous conviction serving as a predicate

offense under § 10G must result from a separate prosecution, and

not simply from a separate criminal event.  The three

considerations are the Legislature's departure from the language

used in the Federal ACCA, the analysis of cases from other

jurisdictions, and the rule of lenity.

The Federal ACCA provides:

"In the case of a person who violates [18 U.S.C. §922(g)] and has three previous convictions . . . for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined under this title and imprisoned not less than fifteen years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person with respect to the conviction under [§] 922(g)" (emphasis supplied).

18 U.S.C. § 924(e)(1).  The language "committed on occasions

different from one another" was added to the Federal ACCA by

---

[16] The legislative record of the omnibus bill's enactment includes two recommendations from the Governor's legislative director to his legislative office and a House of Representatives "Executive Bill Summary" memorandum, both of which provide summaries of the bill by section.  With respect to § 10G, the documents state that if a defendant has "three previous felony convictions the punishment shall be imprisonment in a [S]tate prison for not less than [fifteen] nor more than [twenty] years," but do not address the timing of those convictions in relation to each other, or the statutory phrase "arising from separate incidences."

amendment in 1988.  See Pub. L. No. 100-690, 102 Stat. 4181, § 7056 (1988).  In United States v. Letterlough, 63 F.3d 332, 335 (4th Cir.), cert. denied, 516 U.S. 955 (1995), the United States Court of Appeals for the Fourth Circuit articulated the test that it noted was used by the courts of almost every Federal Circuit for determining whether the Federal ACCA applies to a defendant's prior crimes:  "Convictions occur on occasions different from one another 'if each of the prior convictions arose out of a 'separate and distinct criminal episode"'" (emphasis in original).  Id., quoting United States v. Hudspeth, 42 F.3d 1015, 1019 (7th Cir. 1994), cert. denied, 515 U.S. 1105 (1995).

The Legislature enacted the Massachusetts ACCA ten years after the Federal ACCA was amended to include the phrase "committed on occasions different from one another" and three years after the Letterlough decision.  The Massachusetts ACCA adopts the definitional language of the Federal ACCA.[17]  See Commonwealth v. Colon, 81 Mass. App. Ct. 8, 12 (2011).  See also Commonwealth v. Eberhart, 461 Mass. 809, 815 (2012).  However, we disagree with the Commonwealth that the Massachusetts statute

---

[17] A comparison of the definitions of "violent crime" and "serious drug offense" in the Massachusetts ACCA with the language used by Congress to define "violent felony" and "serious drug offense" in the Federal ACCA indicates that the two definitions are virtually identical in substance; the inference that the Legislature had the Federal ACCA in mind when enacting the Massachusetts ACCA appears inescapable.

"largely replicates," Colon, supra, the entire structure of its Federal counterpart.  In fact, § 10G departs from the Federal ACCA precisely in relation to the language in contention here, namely, the description of what makes a prior violent crime or serious drug offense qualify as a predicate offense.  That is, § 10G does not incorporate the Federal ACCA language that the crimes be "committed on occasions different from one another," 18 U.S.C. § 924(e)(1), to qualify, but rather requires that the predicate crimes be ones "arising from separate incidences."  Considering the Legislature's obvious awareness of the language used in the Federal ACCA (witness the § 10G definitions) and the Legislature's presumptive knowledge of the nearly uniform judicial interpretation of the phrase "committed on occasions different from one another,"[18] its decision to use different words to refer to qualifying offenses suggests that the Legislature affirmatively intended to enact a sentence enhancement scheme that did not march in lock step with the Federal ACCA.  Differences in language between a State statute and a previously enacted, analogous Federal statute "reflect a conscious decision by the Legislature to deviate from the standard embodied in the Federal statute."  Globe Newspaper Co.

---

[18] Cf. Commonwealth v. Callahan, 440 Mass. 436, 441 (2003) (we "presume that the Legislature is aware of the prior state of the law as explicated by the decisions of this court" [citation omitted]).

v. <u>Boston Retirement Bd.</u>, 388 Mass. 427, 433 (1983). See <u>Commonwealth</u> v. <u>McGhee</u>, 472 Mass. 405, 413 n.8 (2015). We therefore reject the Commonwealth's argument, adopted by the dissent, that in § 10G the Legislature simply employed different words to convey the exact same meaning as the Federal ACCA.

That the Legislature had a sentencing scheme different from the Federal ACCA in mind when it enacted § 10G is made even more clear when the structures of the Massachusetts and Federal statutes are compared. The Federal ACCA imposes only one level of enhancement that comes into play after three qualifying offenses; in contrast, § 10G provides for three separate levels of enhancement, each with an increasing mandatory minimum sentence depending on the number of predicate offenses committed, up to a maximum of three -- i.e., a graduated approach to enhanced penalties. Again, given its familiarity with the Federal statute, the Legislature's rejection of the single, "three strikes, you're out" model of 18 U.S.C. § 924(e) and the adoption of a graduated approach is significant.

In terms of structure, the Massachusetts ACCA shares less in common with the Federal ACCA than it does with a large number of armed career criminal sentencing statutes with graduated penalty provisions that have been enacted by other States. The language of these statutes varies, but a majority of State appellate courts have interpreted statutory provisions providing

progressively longer sentences for crimes a defendant commits after having been previously convicted of one, two, or three qualifying offenses to require that the prior convictions be sequential -- i.e., that the first conviction (and imposition of sentence) occur before the commission of the second predicate crime, and the second conviction and sentence occur before the commission of the third crime.  See, e.g., Commonwealth v. Shiffler, 583 Pa. 478, 480, 492-495 (2005).  See also Hall v. State, 473 A.2d 352, 356-357 (Del. 1984); State v. Lohrbach, 217 Kan. 588, 591 (1975); State v. Ellis, 214 Neb. 172, 174-176 (1983).[19]  See generally Annot., Chronological or Procedural Sequence of Former Convictions as Affecting Enhancement of Penalty under Habitual Offender Statutes, 7 A.L.R. 5th 263, §§ 2(a), 7(d) (1992 & Supp. 2015).[20]

---

[19] But see, e.g., Watson v. State, 392 So. 2d 1274, 1279 (Ala. Crim. App. 1980) (no requirement that prior convictions be sequential); Knight v. State, 277 Ark. 213, 215-216 (1982) (same); People v. District Court in & for the County of Larimer, 643 P.2d 37, 38-39 (Colo. 1982) (same); Stradt v. State, 608 N.W.2d 28, 29-30 (Iowa 2000) (same).

[20] It bears noting that despite the actual language and judicial interpretation of the Federal ACCA -- which, as we have discussed, focuses on whether the prior convictions involved distinct criminal episodes -- the United States Sentencing Commission has adopted guidelines providing that simultaneous convictions, i.e., convictions charged in the same charging instrument or for which sentences are entered on the same day, should qualify only as a single predicate offense under the Federal ACCA, unless the offenses were separated by intervening arrests.  See Federal Sentencing Guidelines Manual § 4A1.2(a)(2) (updated Nov. 2015).

The rationale underlying the majority view that graduated sentence enhancement statutes should be interpreted to require sequential prosecutions and convictions of the predicate crimes is well expressed by the Pennsylvania Supreme Court in Shiffler, 583 Pa. at 494:

> "'[T]he point of sentence enhancement is to punish more severely offenders who have persevered in criminal activity despite the theoretically beneficial effects of penal discipline.' . . . Particularly salient here is the implicit link between enhanced punishment and behavioral reform, and the notion that the former should correspondingly increase along with a defendant's foregone opportunities for the latter. Any other conception would ignore the rationale underlying the recidivist philosophy, i.e., that the most culpable defendant is 'one, who after being reproved, "still hardeneth his neck."' . . . The generally recognized purpose of such graduated sentencing laws is to punish offenses more severely when the defendant has exhibited an unwillingness to reform his miscreant ways and to conform his life according to the law" (emphasis in original; citations omitted).[21]

Decisions in other States reflect similar reasoning. See, e.g., State v. Ledbetter, 240 Conn. 317, 328-330, 332 (1997) ("We agree with the defendant that the legislative purpose of [the State's armed career criminal statute] is fulfilled only by requiring a sequence of offense, conviction and punishment, thus allowing a felon the opportunity to reform prior to being labeled a persistent felony offender"); Buckingham v. State, 482

---

[21] Accord Commonwealth v. McClintic, 589 Pa. 465, 483 (2006) ("Following the recidivist logic, each strike that serves as a predicate offense must be followed by sentencing and, by necessary implication, an opportunity for reform, before the offender commits the next strike").

A.2d 327, 330-331 (Del. 1984) (punishment enhanced only for individuals who failed to reform after separate encounters with criminal justice system); Lohrbach, 217 Kan. at 591 ("The basic philosophy underlying recidivist statutes might be expressed in this fashion:  where the punishment imposed against an offender for violating the law has failed to deter him from further infractions, a harsher and more severe penalty is justified, the idea being, hopefully, that the greater punishment may serve as an object lesson and cause him to accomplish his reformation, where the lesser penalty had failed in that respect").[22]

As noted, the available legislative history of the Massachusetts ACCA does not reveal the Legislature's specific rationale or purpose for eschewing the Federal ACCA's approach and establishing a graduated penalty structure tied to the number of a defendant's previous convictions of predicate offenses.  But the Legislature having done so, we are persuaded that the most logical interpretation of § 10G (a)-(c) is one

---

[22] See also State v. Ellis, 214 Neb. 172, 175-176 (1983) ("We believe that the purpose of enacting the habitual criminal statute is to serve as a warning to previous offenders that if they do not reform their ways they may be imprisoned for a considerable period of time, regardless of the penalty for the specific crime charged. . . .  We believe we should join the majority of jurisdictions in their interpretation of the habitual criminal statute, and now, therefore, declare that in order to warrant the enhancement of the penalty under the Nebraska habitual criminal statute . . . the prior convictions, except the first conviction, must be for offenses committed after each preceding conviction, and all such prior convictions must precede the commission of the principal offense").

that reflects and implements the principle that penal discipline can have (or should have) a reforming influence on an offender, with enhanced consequences if prior convictions and sentences do not have such an effect.[23] As a consequence, the most logical and appropriate interpretation of § 10G (c) is that its sentence enhancement of a mandatory minimum of fifteen years applies only when a defendant's previous convictions of three qualifying crimes "arising from separate incidences" were the results of separate, sequential prosecutions.

Finally, insofar as the meaning of "arising from separate incidences" in § 10G (c) is ambiguous,[24] the rule of lenity supports the interpretation we have adopted here:

---

[23] This rationale reflects what the Pennsylvania Supreme Court terms a "recidivist philosophy." See Commonwealth v. Shiffler, 583 Pa. 478, 494 (2005). The dissent contends that there is little to no support for our conclusion that a recidivist philosophy underlies the Legislature's enactment of § 10G. Post at . Certainly the scant legislative history relating to § 10G contains no evidence that the Legislature used that term. But the Legislature's express adoption of a graduated penalty structure in § 10G, increasing the mandatory minimum sentence as the defendant acquires more "strikes," and the decisions of other State courts construing habitual offender statutes akin to § 10G in a manner consistent with the substantive tenets of a recidivist philosophy work together to support our interpretation. See Commonwealth v. Welch, 444 Mass. 80, 85 (2005) (court may use language and construction of related statutes and law of other jurisdictions to determine legislative intent).

[24] The dissent states that § 10G is not ambiguous and asserts that the statute's plain meaning is that "previous convictions are convictions occurring prior to the ACCA violation for offenses 'arising from separate' criminal

> "Under the rule of lenity, 'if we find that the statute is ambiguous or are unable to ascertain the intent of the Legislature, the defendant is entitled to the benefit of any rational doubt.' Commonwealth v. Constantino, 443 Mass. 521, 524 (2005). 'This principle applies to sentencing as well as substantive provisions.' Commonwealth v. Gagnon, 387 Mass. 567, 569 (1982)."

Commonwealth v. Richardson, 469 Mass. 248, 254 (2014). See Commonwealth v. Hamilton, 459 Mass. 422, 436-437 (2011). The Commonwealth posits that § 10G's requirement that qualifying convictions "aris[e] from separate incidences" is satisfied so long as the defendant's conduct underlying the convictions involved distinct criminal offenses even if all the convictions were the result of a single prosecution. This interpretation is not compelled by the language and particularly the structure of § 10G.[25] Accordingly, in this case -- where the defendant's previous drug offense convictions were the result of counts that

---

incidents." Post at    .However, this construction of the statute conflates the terms "incident" and "incidence," which, as discussed previously, have distinct definitions. See note 14, supra. Where the Legislature used the term "incidences" in § 10G, we will interpret the statute with that word in mind, and will not substitute for it a word that means something else.

[25] It is clear that the defendant could not have been sentenced as an armed career criminal under § 10G during the prosecution of the crimes committed in 2006 because those convictions were simultaneous -- i.e., none of the convictions could be considered a previous conviction in relation to any of the others. Allowing the defendant to be sentenced as a third-time repeat offender under § 10G (c) here, despite the fact that he could not have, at any previous time, been charged as even a first-time repeat offender under § 10G (a), is a result that we do not believe the Legislature intended. Cf. Shiffler, 583 Pa. at 492.

were brought at the same time, combined in a single set of charges, prosecuted and handled as a single criminal prosecution, and resolved by guilty pleas in a single plea proceeding -- the convictions represented a single "incidence" for purposes of § 10G. The defendant, therefore, could not be prosecuted or sentenced under § 10G (c) (or § 10G [b]), but could be prosecuted and sentenced pursuant to § 10G (a).

3. Conclusion. The motion judge properly denied the defendant's motions to suppress evidence, and the order denying the motions to suppress is affirmed. With respect to the defendant's appeal from his convictions as an armed career criminal pursuant to G. L. c. 269, § 10G (c), those convictions are vacated, and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

So ordered.

CORDY, J. (dissenting in part, with whom Spina, J., joins). I agree that the defendant's motions to suppress were properly denied. I disagree that the Massachusetts armed career criminal act, G. L. c. 269, § 10G (ACCA), is ambiguous, and would adopt what I perceive to be the plain meaning of its words: previous convictions are convictions occurring prior to the ACCA violation for offenses "arising from separate" criminal incidents. Crimes arising from separate incidents are crimes committed on different occasions as contrasted with multiple crimes arising out of a single occasion or criminal episode.

The issue is purely one of legislative intent at the time of enactment, and, absent any evidence to the contrary, I would not read into the statute a "recidivist philosophy," rather than an intent to ensure public safety by significantly increasing the penalties for persons who commit crimes with firearms after having been convicted of multiple serious felonies.

In my view, the Massachusetts statute should be interpreted as the Federal ACCA statute has been by virtually every Federal Circuit and District Court to undertake the task.[1] 18 U.S.C. § 924(e) (2006) (offenses "committed on occasions different from one another"). So long as the prior offenses of which the

---

[1] See, e.g., United States v. Elliott, 703 F.3d 378, 383 (7th Cir. 2012), cert. denied, 133 S. Ct. 2359 (2013), and United States v. Letterlough, 63 F.3d 332, 335 (4th Cir.), cert. denied, 516 U.S. 955 (1995), and the numerous cases cited therein.

defendant has been convicted arise out of different criminal episodes (whether termed different occasions, occurrences, incidents, or incidences), they should qualify as separate previous convictions for purposes of the Massachusetts ACCA statute.

The court's interpretation would essentially incorporate all crimes, no matter how separate in time, victim, or nature, into a single conviction (for ACCA purposes) if they were eventually resolved by guilty plea or trial in the same prosecution. For example, a person who commits a string of armed robberies in Suffolk County over a period of months and who is eventually apprehended, linked to, charged with, and convicted of all of the robberies, in a combined prosecution, would have only "one" prior felony conviction for purposes of the Massachusetts ACCA statute -- no matter how many robberies he is convicted of committing.

Further, the court suggests that prior convictions must be sequential. In other words, the first conviction must occur before the second predicate crime and its prosecution and conviction, and the second conviction must occur before the commission and prosecution of the third crime, and so on -- apparently, so that the recidivist felon has multiple opportunities to correct his criminal behavior before facing far greater punishment when he once again commits a serious felony,

this time with a firearm.  Hence, by way of example, if the armed robber is prosecuted in Suffolk County, and, subsequent to his conviction, it is determined that before his conviction he had committed a series of armed robberies in Hampden County and is, accordingly, now prosecuted and convicted of those armed robberies, he would still only have one prior conviction under the Massachusetts ACCA statute when and if he commits his next armed felony.  This could not have been what the Legislature intended.[2]

The fact that some State courts have interpreted their own armed career criminal statutes (variously worded) differently (and as this court now would), based on their view of what their Legislatures intended to punish, is not terribly relevant or revealing.[3]  Other State courts have concluded the opposite.[4]

---

[2] The court's interpretation would also result in the following:  An individual is arrested for a serious drug offense and is released on personal recognizance.  He is then arrested for another serious drug offense and is released on bail.  He is finally arrested for an armed robbery and is held without bail. All three separate crimes (for which he has been separately arrested and charged) are eventually resolved by guilty pleas and sentencing in a single plea and sentencing proceeding. Result -- one prior conviction only.

[3] For example, the court cites a Nebraska case, State v. Ellis, 214 Neb. 172, 175 (1983), in support of its proposition that habitual offender statutes should be interpreted in a manner that allows felons the opportunity to "reform their ways."  The Nebraska Supreme Court was, of course, interpreting the meaning and legislative intent behind its own statute, which provided that a habitual criminal is one who has previously "been twice convicted of crime, sentenced and committed to

There is no consensus as to how such statutes, no matter how differently worded or intended, must be interpreted.

I would not infuse our analysis with hindsight doubts about whether the statute has served as an effective deterrent, or whether it might seemingly prove unduly harsh in some circumstances.  That is the Legislature's responsibility, not ours.  And I would not use the modest facts in this case, in which the defendant's prior convictions were for five drug sales, each occurring on a different day during a three-week period, as an excuse to broadly transplant a new policy that has no traceable origin in legislative history, onto a statute plainly intended to protect the public from felons with multiple felony convictions who use firearms in committing new crimes.

---

prison."  Id. at 172-173.  See Neb. Rev. Stat. § 29-2221.  The court, in a four-to-three decision, concluded that where the defendant was convicted of two crimes (robbery and the use of a firearm in the course of the robbery), occurring on the same day, and for which he was sentenced on the same day, he had only one prior conviction and sentence under its statute.  Ellis, supra at 172-173, 175-176.  The court went on to more broadly endorse the "recidivist philosophy" behind its habitual offender statute, see id. at 175, over a vigorous dissent noting that the court had "chosen to substitute doubtful sociological assumptions (without legislative history to show that the Legislature shared its view) for the logical construction of [the] statute."  Id. at 177 (White, J., dissenting).

[4] See, e.g., Watson v. State, 392 So. 2d 1274, 1279 (Ala. Crim. App. 1980); Linn v. State, 658 P.2d 150, 152 (Alaska Ct. App. 1983); Knight v. State, 277 Ark. 213, 215-216 (1982); Stradt v. State, 608 N.W.2d 28, 29-30 (Iowa 2000); Rushing v. State, 461 So. 2d 710, 713 (Miss. 1984).