Commonwealth *vs.* Jovani Jeudy.

No. 07-P-391.

Suffolk. May 1, 2008. - October 28, 2009.

Present: Perretta, Mills, & Rubin, JJ.[1]

*Search and Seizure,* Pursuit, Reasonable suspicion. *Constitutional Law,* Search and seizure, Investigatory stop, Reasonable suspicion. *Firearms.*

A Juvenile Court judge properly denied a criminal defendant's pretrial motion to suppress a firearm discarded by the defendant in the course of a pursuit · on foot by police officers, where the officers had reasonable suspicion, based on specific and articulable facts and inferences therefrom, that the defendant had committed a crime, given the officers' receipt of a police radio report of shots fired in the area, one officer's prior knowledge of the defendant, and the defendant's flight upon seeing the officers approach in an unmarked police vehicle. [582-584]

Complaints received and sworn to in the Suffolk County Division of the Juvenile Court Department on November 1, 2005.

Indictment found and returned in the Superior Court Department on March 6, 2006.

A pretrial motion to suppress evidence was heard by *Marjory A. German,* J., and the cases were tried before *Robert F. Murray,* J.

*Geoffrey DuBosque* for the defendant.

*Stephen Buckley* (*Kristin Lombard O'Donnell,* Assistant District Attorney, with him) for the Commonwealth.

Perretta, J. A Juvenile Court jury found the defendant guilty, as a youthful offender, of carrying a firearm without a license, and adjudicated him delinquent by reason of his illegal possession of ammunition.[2] His sole argument on appeal is that because

---

[1]Justice Perretta participated in the deliberation of this case and authored this opinion prior to her retirement.

[2]A complaint charging the defendant with possession of a firearm with an altered serial number was dismissed at the request of the Commonwealth.

the police lacked reasonable suspicion to justify pursuing or stopping him, the resulting seizure of the firearm was illegal, and his motion to suppress its use as evidence should have been allowed. We conclude that the actions of the police were reasonable and that the motion was properly denied.

1. *The facts.* Based on the evidence presented at the hearing on the defendant's motion to suppress, the judge found the following facts. At about 6:15 P.M. on October 31, 2005, three Boston police officers — Tarantino, Cooley, and Cogivan, all of whom had received extensive training and were assigned to the youth violence strike force unit of the Boston police department — were on patrol in an unmarked police vehicle. As described by Tarantino, the vehicle was a Ford Crown Victoria outfitted with many antennae. He related that in the past, the automobile had been recognized by civilians as a police vehicle even though it was unmarked.

According to the judge's unchallenged findings of fact, Officers Tarantino, Cooley, and Cogivan received a police radio transmission advising that shots had been fired in the area of 134 Ballou Street. The three officers drove to the area of 134 Ballou Street and spoke with various neighbors, who reported that they had heard gunshots and that they believed that a street gang known as the "Lucerne Mascot Gang" was responsible.

Next, the officers drove about three blocks, to the intersection of Morton and Lucerne Streets. There they saw a group of about eight to ten males between the ages of fifteen and twenty years sitting atop a stone wall. Tarantino recognized a number of the males, including the defendant, as individuals who recently had been involved in incidents relating to firearms, that is, "as individuals who had been shot, shot at or arrested in the recent past for firearm-related offenses." Tarantino also knew the defendant to be a member of the "Lucerne Mascot Gang."

When the officers appeared on the scene, the defendant and another male jumped off the wall and ran in the opposite direction from the vehicle. Tarantino believed that the defendant ran because he recognized the unmarked car as a police vehicle. As the defendant and the other male fled down Lucerne Street and toward Winston Road, each grabbed his waistband. Tarantino related that in his training at the police academy and by the United States Treasury Department's Bureau of Alcohol, Tobacco,

and Firearms, he had learned that a suspect will typically conceal a weapon in his waist area for easy access. He was instructed that because a suspect does not ordinarily wear a holster, he will grab or hold the weapon with his dominant hand when running or quickly moving to prevent the weapon from falling from his person. Tarantino also testified that in 2005, he and his partners made at least sixty-four firearm arrests or recoveries.

Based on his training and experience, Tarantino believed that the fleeing defendant possibly was armed with a weapon. He stopped the vehicle, and Cogivan and Cooley got out and chased after the defendant and the other male to see where they were going and whether they would throw away any weapons. When he lost sight of the fleeing defendant and his companion as well as the pursuing officers, Tarantino drove farther down Lucerne Street in the direction he believed the two males were running.

Tarantino drove to and stopped his vehicle at 60 Winston Road, a distance of about fifty yards from where he had first seen the defendant, who lived at 54 Winston Road. From his stationary position, Tarantino saw the defendant crouching by the side of a trash barrel located on the side of a house. He saw that the defendant had one arm "up near the barrel."

Tarantino got out of the car and jogged toward the house just as the defendant ran out from his place by the trash barrel. Tarantino stopped him and pat frisked him for weapons. Finding nothing, Tarantino released the defendant and walked to the trash barrel. Looking inside the barrel, Tarantino saw a firearm with the top slide locked back, which he described as "typical of a firearm that has been . . . fired until there's no ammunition or fired until it jams." He then made radio contact with his partners, who arrived within seconds, signaled the defendant to stop, and arrested him. A search of the area revealed a second gun inside a barbeque grill located behind the house of the male who had fled with the defendant. This second weapon was not attributed to the defendant.

Based on the evidence elicited at the hearing on the motion to suppress, the judge concluded that the defendant was not stopped when Cogivan and Cooley got out of the vehicle and pursued him as he fled. Rather, she determined that the stop of the defendant occurred when Tarantino found the defendant crouched at the

side of his neighbor's house and conducted a justifiable patfrisk of the defendant. Finding no weapons on the defendant's person, Tarantino released him and then looked into the trash barrel and retrieved a gun that "had been abandoned by the [d]efendant" in a place in which the defendant "had no reasonable expectation of privacy."

2. *The argument.* It is the defendant's argument that he was illegally seized when officers Cogivan and Cooley got out of the unmarked police vehicle and pursued him as he fled. See *Commonwealth* v. *Stoute,* 422 Mass. 782, 783 (1996). He contends that because the police had no "reasonable suspicion to suspect [him] of criminal activity" at the time of his seizure, the evidence obtained as a result of the pursuit must be suppressed. *Id.* at 789. In making his argument, the defendant does not claim that any of the judge's factual findings are clearly erroneous. Rather, his quarrel is with the judge's conclusions of law.

3. *Discussion.* We accept the judge's findings of fact absent clear error and make an independent determination as to whether the judge correctly applied constitutional principles to the unchallenged findings of fact. See *Commonwealth* v. *Sykes,* 449 Mass. 308, 310 (2007), and cases therein cited. We also assume, without deciding, that the defendant's assertion is correct, that he was seized at the moment Cogivan and Cooley stepped out of the unmarked police vehicle to pursue him as he fled. Our assumption, however, does not gain the defendant the result he seeks, that is, suppression of the recovered evidence.

It is well established that a seizure is constitutional when "suspicious conduct gives the officer reason to suspect that a person has committed, is committing, or is about to commit a crime." *Commonwealth* v. *Silva,* 366 Mass. 402, 405 (1974). As held in *Commonwealth* v. *Sykes,* 449 Mass. at 314, in reliance on *Commonwealth* v. *Grandison,* 433 Mass. 135, 139 (2001), reasonable suspicion must be based on specific and articulable facts and inferences that follow from an officer's experience rather than on a good faith hunch. For purposes of analyzing the defendant's claim that he was seized when Cogivan and Cooley got out of the vehicle and began to chase him, we proceed on the basis of the judge's unchallenged findings, see part 1, *supra,* as they pertain to the facts known to the officers at the start of the chase.

After receiving a radio report of shots fired in the area of 134 Ballou Street, the police drove to that location and spoke with neighbors, who confirmed having heard gunshots. See *Commonwealth* v. *Dasilva*, 66 Mass. App. Ct. 556, 559-560 (2006) (anonymous tip, when combined with independent police corroboration, can contribute to basis for reasonable suspicion). See also *Commonwealth* v. *Doocey*, 56 Mass. App. Ct. 550, 557-558 (2002) (reports of recently fired gunshots present public safety concerns). When the neighbors informed the officers that they believed that members of the "Lucerne Mascot Gang" had fired the shots, the officers drove three streets to the nearby intersection of Morton and Lucerne Streets. As the officers arrived at that intersection, they saw a group of about eight to ten males, one of whom was the defendant. As previously noted, Tarantino recognized the defendant as being a member of the "Lucerne Mascot Gang" and as having been involved previously in firearm related offenses. See *Commonwealth* v. *Dasilva, supra* at 561 (prior knowledge of suspect may be considered in evaluating officer's reasonable suspicion).

We next consider the defendant's flight upon seeing the Crown Victoria vehicle with its numerous and visible antennae. Although the fact of the defendant's flight, standing alone, is insufficient to justify his seizure, it is a relevant factor to be considered when coupled with other facts pertinent to a determination whether the police can justify the claimed illegal seizure. See *Commonwealth* v. *Wilson*, 52 Mass. App. Ct. 411, 415 (2001) (flight is relevant factor in determining reasonable suspicion). See also Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 4-3[d][2] (2009-2010). There is also the fact that the defendant grabbed at his waistband as he ran, which led Tarantino to believe, based on his training and experience, that the fleeing defendant possessed a concealed firearm. See *Commonwealth* v. *Sykes*, 449 Mass. at 315.

These facts, taken in combination, compel the conclusion that the weapon discarded by the defendant in the course of a pursuit by the police acting on reasonable suspicion did not fall from a poisonous tree. As the court noted in *Commonwealth* v. *Carter*, 424 Mass. 409, 412 (1997), "the police conduct in this case is a

far cry from the type of conduct that should be deterred by application of an exclusionary rule in favor of the defendant."

*Judgment affirmed.*

*Adjudication of delinquency affirmed.*