NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-1746                                        Appeals Court

COMMONWEALTH  vs.  SHANE S., a juvenile.

No. 15-P-1746.

Suffolk.     February 14, 2017. - September 27, 2017.

Present:  Green, Meade, & Agnes, JJ.

Firearms.  Practice, Criminal, Motion to suppress.
    Constitutional Law, Search and seizure, Reasonable
    suspicion.  Search and Seizure, Pursuit, Reasonable
    suspicion.

Complaint received and sworn to in the Suffolk County
Division of the Juvenile Court Department on January 7, 2015.

Indictment found and returned in the Superior Court
Department on March 12, 2015.

Following joinder of the delinquency complaint and youthful
offender indictment, a pretrial motion to suppress evidence was
heard in the Juvenile Court by Peter M. Coyne, J., and the case
was heard by him.

Rebecca L. Rose for the juvenile.
Teresa K. Anderson, Assistant District Attorney, for the
Commonwealth.

AGNES, J.  This appeal follows a jury-waived trial which

resulted in a determination that the juvenile was a youthful

offender by unlawfully possessing a firearm in violation of G. L. c. 269, § 10(a), and delinquent by reason of carrying a loaded firearm without a firearm identification card in violation of G. L. c. 269, § 10(n). The juvenile was committed to the custody of the Department of Youth Services until age twenty-one. The sole question on appeal is whether the motion judge, who also was the trial judge, erred in denying the juvenile's pretrial motion to suppress evidence. More particularly, the juvenile contends that he was unlawfully seized by the police without reasonable suspicion or probable cause, and that the firearm and ammunition offered in evidence at his trial should have been suppressed as the fruits of that claimed unlawful seizure. We affirm.

Background. Two Boston police officers testified at the hearing on the juvenile's motion to suppress. The following account is based on the judge's findings of fact and other testimony by the officers, which the judge implicitly credited. See Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015). On January 6, 2015, Officer Eric Merner responded to a radio broadcast that a person on conditional release from a pending criminal charge, Dion Ruiz, was in a global positioning system (GPS) exclusion zone in the area of Washington and Ruggles

Streets in Boston.[1]  Officer Merner received a picture of Ruiz on his cellular telephone (cell phone), and proceeded to the area to search for Ruiz.  As he approached the area in question, Officer Merner observed the juvenile in this case standing on the corner of Washington and Ruggles Streets.  Officer Merner's attention was initially drawn to the juvenile because the juvenile was near the area where he was searching for Ruiz. Further down Washington Street, Officer Merner located Ruiz, whom he identified based on the photograph he had received. While observing Ruiz, Officer Merner noticed the juvenile approaching Ruiz at a "light jog" while maintaining eye contact with Ruiz.  As the juvenile jogged toward Ruiz, he held both of his hands in front of his "belt buckle area" at his waist, with his elbows sticking out to the sides.  This drew Officer Merner's attention as an unnatural way of jogging.  Officer Merner had undergone specialized training on the characteristics of an armed person, one of which included walking or running with arms pinned down so as to hold onto a firearm.

Officer Merner observed the juvenile meet Ruiz and have a conversation before they walked away together along Washington Street.  Officer Merner, in plain clothes and in an unmarked

---

[1] Ruiz had been charged in connection with a prior shooting incident, and was under conditions of release that required him to wear a GPS monitoring bracelet and to stay away from the area of Washington and Ruggles Streets, where the victim lived.

car, then radioed for a patrol car to stop Ruiz. Officer David Crabbe and his partner responded to the call. Upon arriving on the scene, Officer Crabbe observed the juvenile and Ruiz walking together. Officer Crabbe and his partner exited their vehicle approximately thirty feet in front of the juvenile and Ruiz, who were walking in the officers' direction, and waited on the sidewalk for them to approach. When the juvenile and Ruiz drew near, Officer Crabbe said, "Hey, guys, can I talk to you for a sec?" and the juvenile and Ruiz stopped walking. It was Officer Crabbe's intention to retrieve a picture of Ruiz on his cell phone and ask, "Are you Dion Ruiz?" However, as he was taking out his cell phone and asking the question, the juvenile fled, running past Officer Crabbe, who dropped his cell phone.

After picking up his cell phone from the ground, Officer Crabbe turned around and observed the juvenile running away. At that point he had not made a decision whether to follow the juvenile. Officer Crabbe, like Officer Merner, had undergone training in identifying the characteristic movements of someone who is armed with a firearm. He observed the juvenile running with "his right arm being pinned up against his -- the right side of his body as he was running with his left hand swinging fully." Based on this observation, Officer Crabbe believed that the juvenile might be carrying a firearm, and decided to run after him. Officer Crabbe did not call out to the juvenile to

stop, or otherwise indicate to the juvenile that he was following him.  While following the juvenile, Officer Crabbe observed him pause near two grills against the side of a building, bend over at the waist next to the grills, then straighten up and resume running.  Officer Crabbe observed that after bending down near the grills, the juvenile ran for the first time with both arms swinging freely.

While running after the juvenile, Officer Crabbe lost sight of him several times.  Shortly thereafter, roughly one block away, Officer Crabbe and Officer Merner, who had driven his car around the block, encountered the juvenile.  He was walking toward the officers at a normal pace, "as if trying to blend in."  The officers approached the juvenile.  They had a brief conversation during which Officer Crabbe placed his hand on the juvenile's chest and felt his heart beating "very quickly."  Officer Crabbe also observed that the juvenile was breathing heavily.  Officer Merner noted that the juvenile appeared "a bit excited."  Shortly thereafter, the juvenile was placed in handcuffs; a patfrisk of his person did not yield any weapons.[2]  Officer Crabbe retraced the juvenile's flight path to where he

---

[2] Officer Crabbe was unsure if the juvenile was handcuffed before or after discovery of the firearm while Officer Merner testified that the juvenile was handcuffed "shortly after" they encountered him.  However, the precise moment the juvenile was handcuffed is not material to our analysis.

had observed the juvenile pausing to bend down near the two grills.  In the area of the grills Officer Crabbe discovered a loaded firearm.

Discussion.  1.  Standard of review.  "In reviewing a ruling on a motion to suppress evidence, we accept the judge's subsidiary findings of fact absent clear error and leave to the judge the responsibility of determining the weight and credibility to be given [to the] testimony presented at the motion hearing."  Commonwealth v. Wilson, 441 Mass. 390, 393 (2004).  However, "[w]e review independently the application of constitutional principles to the facts found."  Ibid.  The Commonwealth bears the burden of demonstrating that the actions of the police officers were within constitutional limits. Commonwealth v. DePeiza, 449 Mass. 367, 369 (2007).

2.  Police surveillance does not constitute a seizure.  In cases involving street encounters between the police and civilians that result in the seizure of contraband such as firearms or drugs, determining the moment when the person was seized is often the critical question that the judge must decide.  See Commonwealth v. Barros, 435 Mass. 171, 173 (2001). Massachusetts law adheres to an objective standard whereby a person has been "seized" by a police officer "if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."

Commonwealth v. Borges, 395 Mass. 788, 791 (1985), quoting from United States v. Mendenhall, 446 U.S. 544, 554 (1980). "Whether, and when, a seizure has occurred 'will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.'" Commonwealth v. Evans, 87 Mass. App. Ct. 687, 690-691 (2015), quoting from Michigan v. Chesternut, 486 U.S. 567, 573 (1988). See Terry v. Ohio, 392 U.S. 1, 13 (1968).

In the present case, before the police approached the juvenile, Officer Merner observed him jog toward Ruiz while holding his hands at his waist with his elbows sticking out. Police surveillance, consisting of observations of a person's movements in public places, is not a seizure and does not require any level of suspicion. Commonwealth v. Williams, 422 Mass. 111, 116 (1996).[3]

3. The police questioning did not constitute a seizure. The Supreme Judicial Court and this court have often considered

---

[3] See Commonwealth v. Stoute, 422 Mass. 782, 789 (1996) ("no Terry-type stop occurred when [o]fficer initially asked the defendant and his companion to 'hold up a minute'"); Commonwealth v. Grandison, 433 Mass. 135, 138 (2001) (following individual for surveillance purposes without use of blue lights, flashers, or sirens is not pursuit); Commonwealth v. Moore, 32 Mass. App. Ct. 924, 924 (1992) (surveillance does not implicate constitutional protections). See also Evans, 87 Mass. App. Ct. at 689 ("The fact that the police offered no justification for deeming the defendant worthy of investigation does not turn their initial actions into a seizure").

street encounters between the police and a civilian in which the police ask a question in an effort to identify the civilian or to gather information about a report of criminal activity in the area. "There is no seizure where police merely ask questions unless a reasonable person, given the circumstances of the encounter, would believe he was not free to walk away." Commonwealth v. Franklin, 456 Mass. 818, 820 (2010).[4] Contrast Evans, 87 Mass. App. Ct. at 692 (explaining that duration and intensity of police questioning can be "sufficiently intimidating" that reasonable person in defendant's position would feel compelled to answer). Here, the judge was correct in ruling that by approaching Ruiz and the juvenile and simply asking, "Hey, guys, can I talk to you for a sec?" Officer Crabbe did not seize the juvenile.

4. <u>The police pursuit did not constitute a seizure</u>. "Whether a police 'pursuit' will be considered a seizure depends on the particular nature of the law enforcement action." Commonwealth v. Sykes, 449 Mass. 308, 312 (2007). Here, the

---

[4] See Commonwealth v. Murdough, 428 Mass. 760, 763 (1999) ("officers may make inquiry of anyone they wish . . . so long as they do not implicitly or explicitly assert that the person inquired of is not free to ignore their inquiries"); Barros, supra at 173-176 (consensual encounter transformed into seizure by police pursuit after command to "[c]ome here"); Commonwealth v. Martin, 467 Mass. 291, 303 (2014) (conduct of police who called out to defendant, "hold up," "stop," or "we want to talk to you," treated as request and not command and did not convert encounter into seizure).

juvenile argues in the alternative that he was seized by the police as soon as Officer Crabbe began to pursue him. There is no evidence in the record that Officer Crabbe called out to the juvenile to stop or that the juvenile was aware that Officer Crabbe was chasing him.[5] Officer Crabbe testified that when the juvenile ran past him, "I let him run for a little bit so I could observe." Officer Crabbe then explained that he began to run after the juvenile, observed the juvenile appear to hide something in the area where the police later discovered a firearm, and eventually, after losing sight of him several times, saw the juvenile walking from the corner of a building. There is no evidence that the juvenile looked back at Officer Crabbe. When he saw the juvenile, Officer Crabbe approached him, asked a question, and put his hand on the juvenile's chest.[6]

_____

[5] The judge did not express any reservations about the credibility of the police officers who testified at the motion to suppress hearing. Rather, he accepted the testimony of the officers in making his findings and rulings. When testimonial evidence is uncontroverted, as in this case, and implicitly credited by the judge, we are authorized to draw on that evidence to supplement the judge's findings of fact. See Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007).

[6] At this point, the juvenile was seized. See Borges, supra at 790-794. The pertinent testimony regarding the police pursuit was as follows. Officer Crabbe stated: "I didn't follow him directly, because he basically ran an L-shaped pattern. I tried to cut it off and ran at an angle. He made that next corner, and at this point, I just followed him through the Lennox Projects, with the assistant [sic] of -- assistance of some of the residents that told me where he turned. . . . I had lost sight of him a couple of times, but the residents

Massachusetts law, unlike Federal law, provides that a seizure, in the constitutional sense, may occur before police officers, in pursuit of a suspect, physically detain the person. Commonwealth v. Stoute, 422 Mass. 782, 785-789 (1996) (explaining why test for determining when seizure has occurred that was set forth in California v. Hodari D., 499 U.S. 621 [1991], is not compatible with requirements of art. 14 of the Declaration of Rights).  However, a "claim of police 'pursuit' by [a] defendant . . . is not a talismanic formula for converting all police investigation into a stop and seizure." Commonwealth v. Laureano, 411 Mass. 708, 709-710 (1992).  The test we apply is an objective one that is based on the perspective of the person being pursued, i.e., we do not consider the subjective intent of the police officer, see Depeiza, 449 Mass. at 370; Commonwealth v. Pearson, 90 Mass. App. Ct. 289, 292 (2016), but instead ask whether a reasonable person in the position of the person being pursued "would have

---

pointed in the right direction, and I picked him up twice and then lost him one final time."  The juvenile was later located about one block from where Officer Crabbe last saw him.  "We kind of set up a perimeter.  I had turned around and I saw him walking from a corner of a building, walking towards me as if trying to blend in.  I immediately recognized him, and I believe officer Merner did the same thing, and we both -- both approached."  The juvenile did not attempt to flee.  "I asked him where he was coming from, I felt his -- I put my hand on his chest, it was beating very quickly, and he appeared to be out of breath."

believed that he was not free to leave." Borges, 395 Mass. at 791, quoting from United States v. Mendenhall, 446 U.S. at 554.[7,8] See generally Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 4-2 (2017).

---

[7] "[S]tops provoke constitutional scrutiny because they encumber [a person's] freedom of movement. Pursuit that appears designed to effect a stop is no less intrusive than a stop itself. Framed slightly differently, a pursuit, which, objectively considered, indicates to a person that he would not be free to leave the area (or to remain there) without first responding to a police officer's inquiry, is the functional equivalent of a seizure, in the sense that the person being pursued is plainly the object of an official assertion of authority, which does not intend to be denied, and which infringes considerably on the person's freedom of action." Stoute, supra at 788-789 (quotation and footnotes omitted).

[8] The following cases illustrate how this principle has been applied when the pursuit is by means of a vehicle. See Commonwealth v. Battle, 365 Mass. 472, 475 (1974) (when two persons ran into building in "apparent response" to approaching police car, "police had the right -- if not the duty -- to conduct further visual investigation while the two persons remained in public view"); Commonwealth v. Thibeau, 384 Mass. 762, 764 (1981) (pursuit designed to effect stop encumbers freedom of movement, necessitating constitutional scrutiny); Commonwealth v. Smigliano, 427 Mass. 490, 491-492 (1998) (activation of police car's blue lights constituted seizure, requiring reasonable suspicion of criminal activity); Commonwealth v. Grandison, 433 Mass. 135, 138 (2001) (following individual for surveillance purposes without use of blue lights, flashers, or sirens is not pursuit); Commonwealth v. Lopez, 451 Mass. 608, 612 n.2 (2008) (no seizure where police followed defendant but did not issue any orders, block him from leaving, or activate cruiser's blue lights); Commonwealth v. Dasilva, 56 Mass. App. Ct. 220, 224-225 (2002) (police conduct in following lone bicyclist and twice ordering him to stop with unmistakable intent of requiring him to submit to police inquiries amounted to seizure). See also Cypher, Criminal Practice and Procedure § 4.7, at 185-186 (4th ed. 2014).

In <u>Franklin</u>, 456 Mass. at 821-823, the court clarified the application of the objective test for determining whether a seizure has occurred in the setting of police pursuit.  The facts in <u>Franklin</u>, <u>supra</u>, were as follows.

> "At approximately 6:40 <u>P</u>.<u>M</u>. on November 18, 2006, four police officers of the youth violence strike force were patrolling the Harmon Street area in the Mattapan section of Boston, which had been identified by police as a high crime area.  The officers were in an unmarked Ford Crown Victoria automobile usually recognized in this area as an unmarked police car.  The officers observed two young black males talking in front of 43 Harmon Street.  None of the officers knew either of the men.  As the police car approached the two men, one of them, the defendant, looked at the car, stopped talking, and began looking around.  The police car stopped; immediately after that, the defendant took off running down Harmon Street away from the police car.  One of the officers said, 'He's running,' and three of the officers got out of the car, with two of them running after the defendant.  As they ran, the two officers saw the defendant holding his hand to his waist.  Based on their experience and training, they both concluded that he had contraband, probably a weapon, in his waistband.  The defendant ran toward a six foot tall stockade fence.  Both officers saw him throw an item over the fence and they both heard a metallic sound when the item hit something hard like cement or asphalt on the other side of the fence.  The defendant was stopped by the officers as he attempted to climb over the fence.  He was brought to the ground and handcuffed."

<u>Id</u>. at 819-820 (quotations omitted).

In <u>Franklin</u>, the court rejected the defendant's argument and the judge's ruling that a seizure occurred when the police left their cruiser and began to chase the defendant.  The defendant's flight in <u>Franklin</u> "was not prompted by anything the police did and, indeed, began before the officers got out of

their vehicle.  There was no evidence that the police exercised any show of authority or commanded the defendant to stop."  <u>Id</u>. at 822-823.[9]  In other words, as we observed six years before <u>Franklin</u>, "[t]hough flight alone does not create reasonable suspicion to justify a threshold inquiry, merely running after a running person, without more, does not effect a seizure in the constitutional sense."  <u>Commonwealth</u> v. <u>Perry</u>, 62 Mass. App. Ct. 500, 502 (2004).

In the present case, the judge found that the officers were at the scene in order to arrest Ruiz for violating a pretrial condition of his release.  When Officer Crabbe approached Ruiz and the juvenile, "it was specifically to stop Mr. Ruiz."  The question directed to the pair by Officer Crabbe did not signal to the juvenile that he was not free to leave.  This case is governed by the reasoning in <u>Franklin</u>, <u>supra</u>, because the police

---

[9] The concurring opinion in <u>Franklin</u>, <u>supra</u>, underscored the nature of the majority's holding by suggesting that in different circumstances, in which the police communicate to the suspect an intention to restrain that person's liberty, a seizure in the constitutional sense has occurred.  "Being chased by police officers at close quarters at a fast running pace and for some distance, a reasonable person would conclude 'that "the object of chase is capture," that is, that the police purpose is "to restrain his liberty, not merely to be afforded the opportunity to talk to him," that consequently "if he stopped running, he would not be free to leave," and that "in effecting his capture, the police will resort to physical force if necessary"' (footnotes omitted).  4 W.R. LaFave, Search and Seizure § 9.4(d), at 459 (4th ed. 2004), and cases cited."  <u>Franklin</u>, <u>supra</u> at 824 (Marshall, C.J., concurring).

pursuit was not accompanied by words or conduct that would communicate to a reasonable person in the position of the person walking, running, or otherwise leaving the scene that the police are making an effort to capture him.[10]

5.  The seizure was justified.  "An officer has the right to 'make a threshold inquiry where suspicious conduct gives the officer reason to suspect that a person has committed, is committing, or is about to commit a crime.'"  Commonwealth v. Watson, 430 Mass. 725, 729 (2000), quoting from Commonwealth v. Silva, 366 Mass. 402, 405 (1974).  Reasonable suspicion must be based on "specific and articulable facts and the specific reasonable inferences which follow from such facts in light of the officer's experience."  Silva, supra at 406.  "The facts and inferences underlying the officer's suspicion must be viewed as a whole when assessing the reasonableness of his acts."  Commonwealth v. Thibeau, 384 Mass. 762, 764 (1981).  Here, we conclude that the officers had reasonable suspicion to believe that the juvenile was armed based on the factors described

_____

[10] See Commonwealth v. Powell, 459 Mass. 572, 578 (2011) ("When [the o]fficer began following the defendant on foot, he had not exercised any show of authority or commanded the defendant to stop; and the officers had not blocked or impeded the defendant's path.  It was not until [the o]fficer drew his weapon, pointed it at the defendant, and commanded the defendant to '[d]rop it,' that a seizure occurred").

below, all of which were found by the judge to support the actions taken by the officers.

Here, the moment of seizure was when Officer Crabbe put his hand on the juvenile's chest. Under the circumstances, a reasonable person in the juvenile's position would not feel free to leave. See Borges, 395 Mass. at 790-793. Officer Merner and Officer Crabbe had observed the juvenile jogging and running with his arms held in an unusual manner against his body. Based on their training and experience, the officers were aware that this behavior was consistent with a person concealing an unholstered firearm.[11] This behavior took on greater significance after Officer Crabbe observed the juvenile stop running, pause and bend down near two grills, and resume running with both his arms swinging freely (instead of only one) in the manner associated with the natural stride of a person who is running. These observations were sufficient to support an inference that the juvenile was carrying a firearm while holding his hands to his waistband and running, and that he removed the

---

[11] The juvenile, without citing any authority, argues in a footnote in his brief that the judge erred by considering Officer Merner's observations of the juvenile's unnatural jogging style when discussing Officer Crabbe's reasonable suspicion, claiming that Officer Merner's knowledge cannot be attributed to Officer Crabbe. Our courts have routinely imputed a police officer's knowledge of certain facts to other officers engaged in a joint enterprise when determining questions of reasonable suspicion or probable cause. See Commonwealth v. Montoya, 464 Mass. 566, 576 (2013).

firearm and placed it in the vicinity of the two grills before resuming his run without his hands at his waistband.  See Commonwealth v. Gunther G., 45 Mass. App. Ct. 116, 119 (1998) (because license to carry firearm only may be issued to persons twenty-one years of age or older, G. L. c. 140, § 131(d)(iv), apparent minor's possession of firearm "may be viewed as presumptively illegal").

In addition, there was testimony that the area in which these events occurred were areas where there had been gang activity, and had been the scene of previous firearm incidents.[12] In fact, Ruiz, with whom the juvenile was observed associating, had been charged in connection with a prior shooting.  This combination of factors, taken together, amounted to sufficient reasonable suspicion necessary to justify Officer Crabbe's seizure of the juvenile.  See Williams, 422 Mass. at 117.  See also Commonwealth v. Fraser, 410 Mass. 541, 545 (1991) ("a combination of factors that are each innocent of themselves may, when taken together, amount to the requisite reasonable belief").

---

[12] While the judge here explicitly found that there was not sufficient evidence to support a finding that the area was a "high crime area," he did find that the area had a history of gang activity and at least one recent shooting.  This finding is supported by the record.  Officer Merner testified that he had personally responded to calls in that area for shots fired and persons shot, and that he had made numerous firearm arrests in that area.

The circumstances in this case are quite different from those in Commonwealth v. Warren, 475 Mass. 530, 538-540 (2016), where the court held that a black male's flight from the police did not support a reasonable inference of consciousness of guilt.[13]  In Warren, the defendant was walking in the company of another black male at 9:40 P.M. in the Roxbury section of Boston.  The defendant fled when approached by a police officer who was searching for three perpetrators of a burglary that took place in a home about one mile away.  The officer had only a vague description of the three perpetrators as black males wearing red and black hoodies and dark clothing.  Id. at 531-532.  See Commonwealth v. Meneus, 476 Mass. 231, 235 (2017) (backing away from police encounter to avoid patfrisk, absent other indicia of connection to reported shooting in area, did not justify reasonable suspicion).  Here, by contrast, Officer Crabbe approached the juvenile and Ruiz only after Ruiz had been identified by Officer Merner as being in violation of his conditions of release in a pending case involving a firearm.  It appeared that Ruiz and the juvenile knew each other.  Prior to his flight, it was both the manner in which the juvenile approached Ruiz, with both hands placed together at his waist with his elbows sticking out, and the manner in which he ran

---

[13] The parties have not provided us with any citation to the record that suggests the juvenile's race.

away from the police with one arm pinned against his waist that supported the officers' suspicion that he was armed.  The officers' suspicion that the odd way of jogging and running was a sign that the juvenile had a firearm was not a mere "hunch," Commonwealth v. Wren, 391 Mass. 705, 707 (1984), but was the result of the application of their experience and training to their observations of the juvenile.  See Commonwealth v. Resende, 474 Mass. 455, 461 (2016) (State trooper "observed the defendant holding his hand at his waist in a manner that [the trooper] believed from his training and experience was consistent with someone holding a gun in the waistband of his pants"); Commonwealth v. Jeudy, 75 Mass. App. Ct. 579, 583 (2009) (defendant's flight, where he "grabbed at his waistband as he ran, . . . led [the police officer] to believe, based on his training and experience, that the fleeing defendant possessed a concealed firearm").  See Commonwealth v. Silva, 440 Mass. 772, 784 (2004) ("police officers' expertise and experience may be considered as a factor in probable cause determination").

For the above reasons, we conclude that the juvenile was not seized until the police put their hands on him after the foot chase.  Accordingly, the police properly seized the loaded firearm discovered next to the grills.  The judge's order denying the juvenile's pretrial motion to suppress was correct.

On the charge of possession of a firearm without a license, the judgment is affirmed.  On the charge of possession of a loaded firearm without a firearm identification card, the adjudication of delinquency is affirmed.

<u>So ordered</u>.