SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. DASAHN CROWDER

 
 Docket:
 SJC-13616
 
 
 Dates:
 January 6, 2025. - March 25, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Dewar, & Wolohojian, JJ.
 
 
 County:
 Middlesex
 

 
 Keywords:
 Firearms. Constitutional Law, Right to bear arms, Double jeopardy. Practice, Criminal, Double jeopardy, Motion for a required finding, Motion to suppress, New trial. License. Search and Seizure, Reasonable suspicion, Probable cause, Protective frisk. Probable Cause.
 
 

             Complaint received and sworn to in the Malden Division of the District Court Department on January 7, 2021.
            A pretrial motion to suppress evidence was heard by Emily A. Karstetter, J.; the case was tried before David E. Frank, J., and a motion for postconviction relief was heard by him.
            The Supreme Judicial Court granted an application for direct appellate review.
            Hannah Taylor for the defendant.
            Jamie Michael Charles, Assistant District Attorney (Timothy Ferriter, Assistant District Attorney, also present) for the Commonwealth.
            Christopher DeMayo, for Lorenzo Jones, amicus curiae, submitted a brief.
            KAFKER, J.  A jury found the defendant, Dasahn Crowder, guilty of one count of carrying a firearm without a license, in violation of G. L. c. 269, § 10 (a).  The defendant was sentenced to an eighteen-month term of incarceration in a house of correction, the minimum term required by statute.
            The defendant's trial occurred in the interim between two cases involving firearms regulation:  the United States Supreme Court's decision in New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022) (Bruen), and this court's decision in Commonwealth v. Guardado, 491 Mass. 666 (Guardado I), S.C., 493 Mass. 1 (2023) (Guardado II), cert. denied, 144 S. Ct. 2683 (2024).  In light of these decisions, the defendant appeals from the denial of his posttrial motion for entry of a finding of not guilty.  Alternatively, if subject to a new trial, the defendant requests that this court reverse the denial of his motion to suppress evidence and statements obtained at the scene of the traffic stop precipitating the defendant's arrest.  He also asks this court to address various issues that may recur at a new trial.
            For the reasons discussed infra, we affirm the denial of the defendant's posttrial motion for a required finding of not guilty and order a new trial on the charge of carrying a firearm without a license.  We also affirm the denial of the defendant's pretrial motion to suppress the firearm seized during the traffic stop[1] and leave to the new trial judge's discretion the remaining errors raised by the defendant should they arise again.[2]
            1.  Background.  a.  Facts.  We recite the facts as the jury could have found them, reserving certain details for our discussion of the issues.  Commonwealth v. Corey, 493 Mass. 674, 675 (2024).
            At around 10:30 P.M. on January 6, 2021, State police Trooper Alexander Vath observed a vehicle with Maine registration plates traveling at a high rate of speed on Interstate Highway 95 in the Wakefield area.  Using "lidar,"[3] Vath confirmed that the vehicle was traveling ninety-nine miles per hour in a zone with a speed limit of fifty-five miles per hour.  He then proceeded to initiate a motor vehicle stop.
            Once the vehicle came to a stop, Vath observed four individuals inside.  From the passenger's side window, he requested the driver's license and the vehicle's registration.  The driver was unable to provide valid documentation, and Vath determined both that the vehicle was unregistered and that no licensed driver was present in the vehicle.[4]  In accordance with State police policy, Vath initiated an inventory search of the vehicle before it was towed.
            While still the only officer on scene, Vath started to remove the four vehicle occupants one by one to effect the inventory search and tow.  He began with the occupant in the front passenger seat, later identified as the defendant.  As the defendant got out of the vehicle, he "bladed" his stance, such that he "turned his body away from [Vath] slightly with one side of his body pointing generally in [Vath's] direction and the other part pointing away."  Vath then observed the defendant press on his jacket pocket with his left hand.
            Based on his training and experience, Vath believed that the defendant's behavior indicated he was concealing a weapon.  Vath performed a patfrisk of the defendant's jacket pocket and, upon feeling a heavy object inside, reached in and retrieved a Smith & Wesson Shield firearm.  Vath then took the defendant into custody, placed him in the backseat of his cruiser, and called for backup.
            b.  Procedural history.  On January 7, 2021, a complaint issued from the Malden Division of the District Court charging the defendant with receiving a firearm with a defaced serial number, in violation of G. L. c. 269, § 11C (count 1); and commission of a firearm violation with one prior violent or drug crime, in violation of G. L. c. 269, § 10G (a) (count 2).  At his arraignment that day, the defendant pleaded not guilty to both charges.  Count 2 was later amended to the charge of carrying a firearm without a license, in violation of G. L. c. 269, § 10 (a).
            On October 7, 2021, the defendant filed a motion to suppress the firearm seized from him during the motor vehicle stop and a statement he made during the stop indicating he did not have a license to carry a firearm, discussed infra.  After an evidentiary hearing on September 14, 2022, the motion judge denied the motion via margin endorsement on September 21.
            A two-day jury trial commenced on February 14, 2023, before a different judge, at which Vath was the sole witness.  At the close of the Commonwealth's case, the defendant moved for a required finding of not guilty.  The trial judge granted the motion as to count 1 but denied it as to count 2.  On February 15, the jury returned a guilty verdict on count 2, and the trial judge sentenced the defendant to the statutory minimum term of eighteen months in a house of correction.  The defendant filed a timely notice of appeal. 
            After this court's decision in Guardado I, the defendant filed a posttrial motion for entry of a finding of not guilty or, in the alternative, for a new trial, on June 30, 2023, pursuant to Mass. R. Crim. P. 25 (b) (2), as amended, 420 Mass. 1502 (1995).  On July 12, after this court granted in part the Commonwealth's motion to reconsider Guardado I, the defendant filed an amended motion seeking only entry of a finding of not guilty.  The trial judge heard argument on the amended motion on July 13 and subsequently denied the motion without prejudice.  The defendant's motion to stay his sentence pending appeal was granted.  We allowed the defendant's application for direct appellate review in June 2024.
            2.  Discussion.  a.  Proper remedy.  The defendant first contends that it was error for the trial judge to deny his posttrial motion for entry of a finding of not guilty as to the charge of carrying a firearm without a license.  He argues that to retry him on this charge, when his trial occurred after the Supreme Court's decision in Bruen, which declared New York's "may issue" gun licensing scheme unconstitutional, would violate principles of double jeopardy.  He makes this argument even though his trial took place before our decision in Guardado I, which first addressed and resolved the burden of proof issues that are central to his double jeopardy claim in the instant case.  "We review determinations regarding double jeopardy de novo."  Commonwealth v. Edwards, 491 Mass. 1, 13 (2022), quoting Commonwealth v. Taylor, 486 Mass. 469, 477 (2020).  See Commonwealth v. Arias, 488 Mass. 1004, 1006 (2021) (questions of law reviewed de novo); Commonwealth v. Aldana, 477 Mass. 790, 801 (2017) (same).
            i.  Legal background.  It is necessary to frame our discussion with a brief overview of recent developments in jurisprudence concerning the Second Amendment to the United States Constitution that inform the defendant's invocation of double jeopardy principles.
            In its June 2022 decision in Bruen, 597 U.S. at 8-10, the United States Supreme Court established an individual's constitutional right under the Second and Fourteenth Amendments to the United States Constitution to carry a firearm for self-defense outside of the home.  Bruen addressed New York's firearms licensing scheme, which required individuals to apply for and obtain an "unrestricted license to 'have and carry' a concealed 'pistol or revolver'" if they sought to carry firearms for self-defense beyond their home or place of business.  Id. at 12, quoting N.Y. Penal Law § 400.00(2)(f).  Applicants could obtain such licenses only if they proved "proper cause" and were otherwise limited to purpose-restricted public carry licenses.[5]  Bruen, supra, quoting N.Y. Penal Law § 400.00(2)(f).  New York's statutory scheme did not define "proper cause," but courts generally understood the term to require an applicant to "demonstrate a special need for self-protection distinguishable from that of the general community."  Bruen, supra, quoting Matter of Klenosky, 75 A.D.2d 793, 793 (N.Y. 1980).
            After instituting a new framework for assessing the constitutionality of firearms restrictions that requires the State to show that a restriction "is consistent with the Nation's historical tradition of firearm regulation," the Court struck down New York's statutory scheme as an unconstitutional "may issue" licensing regime.  Bruen, 597 U.S. at 11, 19, 24.  Unlike "shall issue" licensing regimes, in which "authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements" and lack discretion to deny licenses "based on a perceived lack of need or suitability," New York's "may issue" regime impermissibly granted authorities "discretion to deny concealed-carry licenses even when the applicant satisfie[d] the statutory criteria."  Id. at 13-14.  See Commonwealth v. Marquis, 495 Mass. 434, 447 (2025) (explaining distinction between "may issue" and "shall issue" regimes).
            Prior to Bruen, our precedent treated firearms licensure as an affirmative defense to the crime of unlawful possession of a firearm under G. L. c. 269, § 10 (a), rather than as an element of the crime for which the Commonwealth bore the burdens of production and of persuasion.  See Commonwealth v. Gouse, 461 Mass. 787, 801-802 (2012); Commonwealth v. Powell, 459 Mass. 572, 582 (2011), cert. denied, 565 U.S. 1262 (2012); Commonwealth v. Tuitt, 393 Mass. 801, 810 (1985); Commonwealth v. Jones, 372 Mass. 403, 406 (1977).  We did so under the ambit of G. L. c. 278, § 7, which provides:  "A defendant in a criminal prosecution, relying for his justification upon a license, appointment, admission to practice as an attorney at law, or authority, shall prove the same; and, until so proved, the presumption shall be that he is not so authorized."
            In first applying § 7 to prosecutions under G. L. c. 269, § 10 (a), in 1977, we bifurcated the burdens of production and of persuasion, with the former allocated to the defendant and the latter allocated to the Commonwealth:
"The holding of a valid license brings the defendant within an exception to the general prohibition against carrying a firearm, and is an affirmative defense. . . .  Absence of a license is not 'an element of the crime,' as that phrase is commonly used.  In the absence of evidence with respect to a license, no issue is presented with respect to licensing.  In other words, the burden is on the defendant to come forward with evidence of the defense.  If such evidence is presented, however, the burden is on the prosecution to persuade the trier of facts beyond a reasonable doubt that the defense does not exist."
Jones, 372 Mass. at 406.  See Gouse, 461 Mass. at 802-803 (reiterating this allocation and collecting cases doing same).
            After the Supreme Court redefined the scope of the Second Amendment in District of Columbia v. Heller, 554 U.S. 570 (2008), and McDonald v. Chicago, 561 U.S. 742 (2010), we reaffirmed the relationship between G. L. c. 278, § 7, and G. L. c. 269, § 10 (a), in Gouse.  Gouse, 461 Mass. at 801 ("Nothing in the McDonald and Heller decisions has altered or abrogated our jurisprudence regarding the elements of the crime of unlawful possession of a firearm or the allocation of the burdens of production and proof with respect to the affirmative defense of licensure").  Accord Commonwealth v. Loadholt, 460 Mass. 723, 727 (2011).
            One year after Bruen issued, we determined in Guardado I that Gouse's treatment of firearms licensure as an affirmative defense was no longer tenable.  Guardado I, 491 Mass. at 690.  Instead, because possession of a firearm outside of the home is constitutionally protected conduct post-Bruen, "the absence of a license is an essential element of the offense of unlawful possession of a firearm pursuant to G. L. c. 269, § 10 (a)."  Id.  General Laws c. 278, § 7, is thus "no longer applicable" to such prosecutions, and the Commonwealth now fully bears the burdens of production and proof to demonstrate "the defendant in fact failed to comply with the licensure requirements for possessing a firearm."  Id.
            Concomitant with this holding, we vacated the Guardado I defendant's convictions of unlawfully carrying a firearm, unlawfully carrying a loaded firearm, and unlawfully carrying ammunition.  Id. at 694.  We also remanded the case "to the Superior Court for entry of judgments of not guilty on those indictments."  Id.  Several months later, however, we granted the Commonwealth's motion to reconsider Guardado I's holding insofar as it required entry of a judgment of not guilty for the defendant, rather than a retrial.  See Guardado II, 493 Mass. at 2.  
            Upon reconsideration of Guardado I, we concluded that the appropriate remedy was, in fact, a retrial of the defendant, rather than vacatur:
"Because the evidence against the defendant was insufficient only when viewed through the lens of a legal development that occurred after trial, the Commonwealth has not been given a fair opportunity to offer whatever proof it could assemble at trial.  Further, because absence of licensure was not recognized as an essential element at the time of trial, the resulting verdict did not resolve this element of the offenses charged. . . . 
"Here, because the Commonwealth reasonably could not have known we would reverse our holdings in [Gouse and similar cases], a judgment of acquittal is not required by principles of double jeopardy.  Without the ability to gaze into the future of this court's and the Supreme Court's rulings, and without any notice from the defendant of an intent to raise the issue of licensure, the Commonwealth simply had no reason to believe that any evidence concerning licensure would be necessary."  (Quotation, citations, and alteration omitted.)
Guardado II, 493 Mass. at 7.  To preclude retrial in these circumstances would have thereby "den[ied] the Commonwealth a 'first opportunity to prove what it did not need to prove before but needs to prove now.'"  Id. at 8, quoting United States v. Harrington, 997 F.3d 812, 818 (8th Cir. 2021).
            ii.  Double jeopardy.  That the Commonwealth must now prove that a defendant does not possess a valid firearms license when prosecuting a defendant for a violation of G. L. c. 269, § 10 (a), is not in dispute, nor is the fact that this particular defendant's existing conviction for violating the statute cannot stand where the Commonwealth did not prove this element at trial.  Rather, we are asked to determine whether the defendant is entitled to a new trial or to a required finding of not guilty.  In Guardado I, unlike in this case, the defendant was tried before Bruen issued.  In the instant case, the defendant was tried after Bruen was issued but before Guardado I.
            We hold today that a new trial is the proper remedy for defendants who were convicted under G. L. c. 269, § 10 (a), after the Supreme Court decided Bruen but before this court decided Guardado I.  We therefore affirm the denial of the defendant's motion for a required finding of not guilty and remand.
            Pursuant to the Fifth Amendment to the United States Constitution, no person "shall . . . be subject for the same offence to be twice put in jeopardy of life or limb."  See Benton v. Maryland, 395 U.S. 784, 794 (1969) (applying Fifth Amendment to States through Fourteenth Amendment).  However, "[i]t has long been settled . . . that the Double Jeopardy Clause's general prohibition against successive prosecutions does not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside . . . because of some error in the proceedings leading to conviction."  Lockhart v. Nelson, 488 U.S. 33, 38 (1988), citing United States v. Tateo, 377 U.S. 463 (1964), and United States v. Ball, 163 U.S. 662 (1896).  See Commonwealth v. DiBenedetto, 414 Mass. 37, 45 (1992), S.C., 427 Mass. 414 (1998) (retrial not prohibited by double jeopardy where conviction vacated due to erroneous admission of testimony).  This "well-established part of our constitutional jurisprudence" goes to the core of striking an appropriate balance between a defendant's right to a fair trial and society's interest in punishing criminal offenses.  Lockhart, supra, quoting Tateo, supra at 465.
            This tenet is not without exception, including, as relevant here, in situations governed by Burks v. United States, 437 U.S. 1, 18 (1978).  In Burks, the Supreme Court held that, when an appellate court reverses a defendant's conviction on the ground of insufficient evidence, the double jeopardy clause prohibits retrial on the same charge.  Id.  See Lockhart, 488 U.S. at 39 (reiterating this holding from Burks).  See also Hudson v. Louisiana, 450 U.S. 40, 44-45 (1981) (where facts of case indistinguishable from Burks, "the Double Jeopardy Clause barred the State from prosecuting petitioner a second time").  The way in which the Court distinguished the appropriate remedy for reversals due to trial error and reversals due to insufficient evidence is particularly informative:
"[R]eversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case.  As such, it implies nothing with respect to the guilt or innocence of a defendant.  Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect . . . .  When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished. . . .
"The same cannot be said when a defendant's conviction has been overturned due to a failure of proof at trial, in which case the prosecution cannot complain of prejudice, for it has been given one fair opportunity to offer whatever proof it could assemble.  Moreover, such an appellate reversal means that the government's case was so lacking that it should not have even been submitted to the jury.  Since we necessarily afford absolute finality to a jury's verdict of acquittal -- no matter how erroneous its decision -- it is difficult to conceive how society has any greater interest in retrying a defendant when, on review, it is decided as a matter of law that the jury could not properly have returned a verdict of guilty."  (Footnote omitted.)
Burks, supra at 15-16.
            Our task is therefore to determine whether the Commonwealth's failure to offer proof of the defendant's lack of a firearms license at trial is better characterized as a trial error or evidence insufficiency.  To do so, we must first answer an antecedent question:  when did the relevant change in law bearing on the elements of a crime under G. L. c. 269, § 10 (a), occur?  In other words, at what point should the Commonwealth have known that the absence of a firearms license was not an affirmative defense to be raised by a defendant, but an element for which the Commonwealth bears the burden of production and proof?
            The defendant contends, inter alia, that Bruen, rather than our decision in Guardado I, is the correct demarcation.  Therefore, he argues, because his trial occurred between Bruen and Guardado I, the Commonwealth was sufficiently on notice that it was required to prove the defendant did not possess a firearms license or firearm identification (FID) card at the time of his trial.  This failure to marshal evidence that the Commonwealth knew or should have known to be essential to a conviction would thus place the case within the ambit of Burks, and retrial of the defendant would be barred as a matter of double jeopardy.  We are not convinced.
            As discussed supra, Bruen constitutionally enshrined "an individual's right to carry a handgun for self-defense outside the home" and held that, for the government to impose a regulation on that individual right, it "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."  Bruen, 597 U.S. at 10, 17.  In so doing, Bruen decided that New York's discretionary "may issue" firearms licensing scheme was unconstitutional under the Second Amendment.  Id. at 11, 70.  It did not address the allocation of the burden of production with respect to criminal violations of a valid firearms licensing scheme, nor did it speak on the requisite elements of such crimes.  See, e.g., id. at 71-72 (Alito, J., concurring) ("[T]oday's decision therefore holds that a State may not enforce a law, like New York's Sullivan Law, that effectively prevents its law-abiding residents from carrying a gun for this purpose.  That is all we decide" [emphasis added]).
            Bruen's holding therefore did not address the relationship between the Commonwealth's licensing scheme and G. L. c. 278, § 7, which, again, provides:  "A defendant in a criminal prosecution, relying for his justification upon a license, appointment, admission to practice as an attorney at law, or authority, shall prove the same; and, until so proved, the presumption shall be that he is not so authorized."  Accordingly, it was Guardado I, not Bruen, that addressed and resolved the legality of such a presumption post-Bruen.
            Until this court decided Guardado I in April 2023, possession of a firearms license remained an affirmative defense for which the defendant bore the burden of production, as it had been for the preceding forty-six years.  See, e.g., Commonwealth v. Harris, 481 Mass. 767, 772 (2019) (characterizing licensure as affirmative defense); Commonwealth v. Allen, 474 Mass. 162, 174 (2016) (same); Gouse, 461 Mass. at 803-805 (same); Loadholt, 460 Mass. at 727 (same); Powell, 459 Mass. at 582 (same); Commonwealth v. Colon, 449 Mass. 207, 226, cert. denied, 552 U.S. 1079 (2007) (same); Commonwealth v. Anderson, 445 Mass. 195, 213-214 (2005) (same); Commonwealth v. Couture, 407 Mass. 178, 181-183, cert. denied, 498 U.S. 951 (1990) (same); Tuitt, 393 Mass. at 810 (same); Jones, 372 Mass. at 406 (same).  In Guardado II, we recognized that Bruen gave rise to, but did not itself effect, this change in the law:  "It only was after the defendant's trial that the Supreme Court issued its decision in Bruen, which in turn led this court to overturn its previous holdings and rule that absence of licensure is an essential element . . ." (emphasis added).  Guardado II, 493 Mass. at 7.
            In concluding that the date of our decision in Guardado I, rather than the date of the decision in Bruen, is determinative here, we are not in any way suggesting that it is our decision-making, and not the Supreme Court's, that is controlling on the requirements of the Second Amendment.  We are unquestionably bound by decisions of the Supreme Court on questions of Federal constitutional law.  Commonwealth v. Vasquez, 456 Mass. 350, 356 (2010).  Commonwealth v. Masskow, 362 Mass. 662, 667 (1972).  Here, however, the Supreme Court had not addressed or decided how the Second Amendment applies to the particular aspects of State law at issue.
            In arguing that Bruen itself, and not Guardado I, shifted the burden of production and changed the elements of a criminal violation of the Massachusetts firearms licensing requirements, the defendant focuses on the statement in Guardado I, 491 Mass. at 694, that the "rule we announce today is dictated by the Court's decision in Bruen."  This reading, however, is divorced from context. 
            Our statement that Bruen "dictated" the result in Guardado I was made specifically with respect to our holding that Guardado I only "applie[d] prospectively and to those cases that were active or pending on direct review as of the date of the issuance" of Bruen.  Guardado I, 491 Mass. at 693-694.  Stated differently, Bruen "dictated" the result in Guardado I insofar as necessary to determine Guardado I's retroactivity under Federal constitutional principles.  See id. at 693, quoting Commonwealth v. Perry, 489 Mass. 436, 463 (2022) ("The retroactivity of a constitutional rule of criminal procedure turns on whether the rule is new or old" [quotations omitted]); Commonwealth v. Bray, 407 Mass. 296, 301 (1990), quoting Teague v. Lane, 489 U.S. 288, 301 (1989) (case "announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final").  It did not "dictate" the result in Guardado I in the sense the defendant proposes.
            As explained above, Bruen, by its own terms, could not have "dictated" the result in Guardado I in the manner argued by the defendant.  Bruen did not define the elements of criminal violations of firearms licensing schemes or who bears the burden of production on such elements.  See Bruen, 597 U.S. at 71-72 (Alito, J., concurring).  In the absence of any such guidance from the Supreme Court, G. L. c. 278, § 7, was still the governing law until this court ruled to the contrary, and neither the trial court nor the Commonwealth was sufficiently on notice as to the effect of Bruen on our existing characterization of licensure as an affirmative defense.  See Guardado II, 493 Mass. at 7 ("Without the ability to gaze into the future of this court's and the Supreme Court's rulings . . . the Commonwealth simply had no reason to believe that any evidence concerning licensure would be necessary").
            The antecedent question thus resolved, we return to the central question on appeal:  is the appropriate remedy for the defendant a new trial or a required finding of not guilty?  Having determined that Guardado I marked the relevant legal change, our holding and rationale in Guardado II as to the proper remedy applies with equal force to the defendant's case.  The defendant is therefore entitled only to a new trial.
            We concluded in Guardado II, 493 Mass. at 6, that double jeopardy protection did not bar a retrial of the defendant because, "[a]t the time of the defendant's trial, this court's precedent clearly had established that absence of licensure was not an essential element of any of the crimes with which the defendant was charged."  Given the state of the law at the time of trial, "the evidence against the defendant was insufficient only when viewed through the lens of a legal development that occurred after trial" -- our decision in Guardado I.  Id. at 7.  Rather than impermissibly afford the Commonwealth a second opportunity to marshal evidence it should have already presented, a new trial was "warranted so that the Commonwealth may have 'one complete opportunity to convict' the defendant under the new law."  Id., quoting Commonwealth v. Hebb, 477 Mass. 409, 413 (2017).  See Guardado II, supra, quoting United States v. Houston, 792 F.3d 663, 670 (6th Cir. 2015) ("the government would not be seeking a second bite at the apple but a first bite under the right legal test").
            So, too, in this case.  Where Gouse remained the controlling law at the time of trial, the Commonwealth could not have known that it was required to prove the defendant did not possess a valid firearms license.  See Guardado II, 493 Mass. at 6-7.  The invalidity of the defendant's conviction stems not from the Commonwealth's failure to produce sufficient evidence at the defendant's trial, but from a posttrial change in the Commonwealth's burden of production.  Id.  See, e.g., United States v. Reynoso, 38 F.4th 1083, 1091 (D.C. Cir. 2022) (defendant "cannot make out a sufficiency challenge as to offense elements that the government had no requirement to prove at trial under then-prevailing law"); United States v. Kim, 65 F.3d 123, 126-127 (9th Cir. 1995) (where prosecution "had no reason to introduce . . . evidence" of element under circuit law at time of trial, sufficiency of evidence as to that element not examined).  Double jeopardy is therefore not a bar to retrial of the defendant, as "[p]ermitting retrial in this instance is not the sort of governmental oppression at which the Double Jeopardy Clause is aimed."  Lockhart, 488 U.S. at 42.  See United States v. Aiello, 118 F.4th 291, 300-301 (2d Cir. 2024), petition for cert. filed, U.S. Supreme Ct., No. 24-958 (Mar. 4, 2025) (change in governing law after trial is "type of trial error" distinct from failure to produce sufficient evidence, and retrial is therefore not prohibited by Burks); Harrington, 997 F.3d at 818 (rationale of Burks "not implicated" where government "is being given a first opportunity to prove what it did not need to prove before but needs to prove now"); United States v. Weems, 49 F.3d 528, 531 (9th Cir. 1995) (retrial does not violate double jeopardy when it "merely permits the government to prove its case in accordance with the recent change in law").
            Finally, the defendant briefly argues that Guardado II was wrongly decided.  Aside from repeating his assertion that "the substantive holding in Guardado I was mandated by the Supreme Court's decision in Bruen," addressed supra, the defendant incorporates by reference arguments raised in Guardado's unsuccessful petition for certiorari to the Supreme Court.  As the preceding discussion demonstrates, our decision in Guardado II -- itself the product of careful reconsideration of part of our holding in Guardado I -- is supported by thorough analysis and a significant body of appellate authority from other jurisdictions.  We therefore decline the defendant's invitation to revisit Guardado II here.
            b.  Denial of defendant's motion to suppress the firearm.  In the alternative, the defendant contends that the motion judge erred in denying his motion to suppress the firearm discovered on his person in two respects:  (1) Vath lacked reasonable suspicion to conduct a patfrisk; and (2) upon identifying the firearm in the defendant's pocket, Vath lacked probable cause to seize it because he did not know whether the defendant was licensed.  
            "In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error but conduct an independent review of [the judge's] ultimate findings and conclusions of law" (quotation omitted).  Commonwealth v. Medina, 485 Mass. 296, 299-300 (2020), quoting Commonwealth v. Cawthron, 479 Mass. 612, 616 (2018).  For the reasons stated infra, we affirm the denial of the defendant's motion to suppress as to the firearm.
            i.  The patfrisk.  The defendant does not challenge the motor vehicle stop or exit order that ultimately led to the patfrisk of his left jacket pocket.  He instead argues that neither his movements while getting out of the vehicle -- namely, in the words of the motion judge, "blading" his body and touching his jacket pocket -- nor any general safety concerns on the part of Vath were sufficient to justify the patfrisk.
            In the context of a lawful motor vehicle stop, "[a] patfrisk is permissible only where an officer has reasonable suspicion that the stopped individual may be armed and dangerous."  Commonwealth v. Sweeting-Bailey, 488 Mass. 741, 744 (2021), cert. denied, 143 S. Ct. 135 (2022), citing Commonwealth v. Torres-Pagan, 484 Mass. 34, 36-37 (2020).  See Commonwealth v. Ng, 420 Mass. 236, 237 (1995) (reasonable suspicion for patfrisk must exist as to "particular individual").  To determine whether an officer indeed had the requisite reasonable suspicion to engage in a patfrisk, "we ask whether a reasonably prudent [person] in the [officer's] position would be warranted in the belief that the safety of the police or that of other persons was in danger" (quotations and citation omitted).  Sweeting-Bailey, supra.  The officer's reasonable suspicion must be based on specific, articulable facts and inferences reasonably drawn therefrom.  See id. at 746; Torres-Pagan, supra at 38-39; Commonwealth v. Almeida, 373 Mass. 266, 271 (1977), S.C., 381 Mass. 420 (1980).  See also Commonwealth v. Silva, 366 Mass. 402, 406 (1974), citing Terry v. Ohio, 392 U.S. 1, 27 (1968) (neither "[a] mere 'hunch'" nor "[s]imple good faith" on officer's part is enough to satisfy reasonable suspicion). 
            Our inquiry is an objective one in which we consider the totality of the circumstances surrounding the patfrisk, including an officer's training and experience.  See Sweeting-Bailey, 488 Mass. at 745, 748; Commonwealth v. Fraser, 410 Mass. 541, 545 (1991); Almeida, 373 Mass. at 271-272.  See also Terry, 392 U.S. at 21 ("it is imperative that the facts [of a search or seizure] be judged against an objective standard").  Thus, the inquiry is also highly fact-specific, as our existing case law demonstrates.  See, e.g., Commonwealth v. Karen K., 491 Mass. 165, 176-179 (2023), and cases cited.
            Relevant to this aspect of the defendant's appeal, the motion judge made the following findings of fact on the record:
"[W]hen the defendant was ordered to get out of the passenger side of the vehicle, he turned that part of his body that had the firearm in a pocket away from the Trooper and put his hand on the pocket where it was located and pressed the pocket up to his body, which the Trooper has been trained to understand to be something called blading, and intending, therefore, to conceal either contraband or a weapon.  And so he did a very limited pat of that pocket, found a firearm with which he is exceptionally familiar, was able to recognize it simply by the feel from the outside, and then he . . . asked or told the defendant to put his hands on his head, removed the firearm from the defendant's pocket, and placed him in handcuffs."
As at the trial, Vath was the only witness at the pretrial motion hearing.  The motion judge credited "all" of his testimony.  Although we "leave to the judge the responsibility of determining the weight and credibility to be given oral testimony presented at the motion hearing . . . , we review independently the motion judge's application of constitutional principles to the facts found" (quotation and citation omitted).  Commonwealth v. Sliech-Brodeur, 457 Mass. 300, 306 (2010).
            We begin with Vath's observations of the defendant after ordering him out of the vehicle.  The defendant complied with the order but, as he got out, "blad[ed]" part of his body and "press[ed] the [left jacket] pocket towards his own person  towards his body."
            "Blading" is a term lacking an exact or consistent definition.  See Karen K., 491 Mass. at 173 (term has "become both unwieldy, lacking precision or a single definition, and tinged with loaded connotations").  That said, we have previously described such conduct as "the action of creating a thin profile of oneself with respect to another viewpoint, effectively hiding one side of the body from the other person's view."  Id. at 172, quoting Commonwealth v. Resende, 474 Mass. 455, 459 n.8 (2016).  Vath's characterization of the defendant's movements roughly aligns with this definition:
"[The defendant made s]ort of a half step -- a rotational step, if you will.  I wouldn't say neither towards nor away.  As he exited the door, he sort of [sic] a crescent move.  I'm not sure how to best define that but turning his body without actually moving his body away from me."
Both on direct and cross-examination, Vath also explained that he received training at the State police academy on "how body postures are manipulated" when a person is concealing a weapon and that he was "specifically trained on [blading] as a stance of potential aggression."  Where, as here, there is a specific, supported finding of "blading," this movement can contribute to the reasonable suspicion calculus.  See Karen K., supra at 174-176; Sweeting-Bailey, 488 Mass. at 746-748; Resende, 474 Mass. at 461; Commonwealth v. DePeiza, 449 Mass. 367, 372 (2007).  See also Commonwealth v. Watson, 430 Mass. 725, 729 (2000) (inferences supporting reasonable suspicion "can follow in light of the officer's experience").
            Particularly when the observed "blading" is considered in tandem with other details of the interaction between the defendant and Vath, we discern no error in the motion judge's finding of reasonable suspicion to justify a patfrisk.  See Karen K., 491 Mass. at 175; DePeiza, 449 Mass. at 372 ("Although nervous or furtive movements do not supply reasonable suspicion when considered in isolation, they are properly considered together with other details to find reasonable suspicion").  See also J.A. Grasso, Jr., Suppression Matters Under Massachusetts Law § 5-3[c][3] (2024 ed.) (furtive gestures by subject of stop "clearly ha[ve] bearing on the question whether there exists a reasonable apprehension of danger to the police . . . that justifies a frisk").
            As Vath watched the defendant "blade" his stance, he also observed the defendant "depress[] [his left] jacket [pocket] against his body" near his belt line, in a manner consistent with the trooper's training in identifying individuals who may be concealing firearms.  Like his observation of "blading," Vath could rightfully consider the defendant's manipulation of his jacket pocket in his determination of reasonable suspicion.  See Karen K., 491 Mass. at 174-176; Sweeting-Bailey, 488 Mass. at 746-748; Resende, 474 Mass. at 461; DePeiza, 449 Mass. at 372.  Cf. Commonwealth v. Stampley, 437 Mass. 323, 327 (2002) (vehicle occupant "retrieving or concealing an object[] raise[s] legitimate safety concerns to an officer conducting a traffic stop").  That Vath was outnumbered four to one while on the side of the highway at around 10:30 P.M. when he observed the defendant's particular movements at close range is yet another factor supporting a finding of reasonable suspicion for a patfrisk.  See Silva, 366 Mass. at 407 (reasonable suspicion analysis of patfrisk took into account that encounter took place in isolated area at night).  Compare, e.g., Commonwealth v. Robinson, 83 Mass. App. Ct. 419, 428-429 (2013) (occupants of minivan outnumbered troopers on scene, contributing to justification for exit order and patfrisk), with Commonwealth v. Darosa, 94 Mass. App. Ct. 635, 648-649 (2019) (officers outnumbering defendant three to one during stop contributed to determination of no reasonable suspicion).
            Taken together, then, the "blading" of the defendant's stance, the way in which the defendant pressed against his pocket, and Vath's inherent safety concern in being outnumbered while effecting this nighttime motor vehicle stop gave rise to reasonable suspicion that the defendant was armed and dangerous.  The patfrisk of the defendant's left jacket pocket was thus permissible, and the motion judge did not err in denying the defendant's motion to suppress the discovered firearm on this basis.
            ii.  Seizure of the firearm.  The defendant also briefly argues that, upon executing the patfrisk, Vath lacked probable cause to seize the firearm found in the defendant's pocket.  More specifically, as the carrying of a firearm outside of one's home for self-defense is now constitutionally protected conduct under Bruen, the defendant argues that it is unconstitutional to presume an individual's possession of a firearm is unlawful, and Vath therefore could not have seized the firearm without first investigating whether the defendant had a license to carry or FID card.  We disagree.
            The defendant again reads into Bruen that which it does not say.  Under Bruen, as discussed supra, ordinary, law-abiding citizens have a constitutional right to carry a firearm outside of the home for self-defense.  See Bruen, 597 U.S. at 8-10.  Bruen did not, however, address Terry-type stops or the constitutionality of an officer's presumptions upon discovering a firearm during a lawful patfrisk.  We thus analyze the seizure of the defendant's firearm under the familiar contours of Terry and its progeny.
            As we have previously explained, "[t]he purpose behind the protective measures allowed by Terry is to enable an officer to confirm or dispel reasonable suspicions that the stopped suspect may be armed with a weapon, thus allowing the officer 'to pursue his investigation without fear of violence.'"  Commonwealth v. Pagan, 440 Mass. 62, 68-69 (2003), quoting Adams v. Williams, 407 U.S. 143, 146 (1972).  Such measures are permissible when "confined to what is minimally necessary to learn whether the suspect is armed and to disarm him should weapons be discovered" (emphasis added).  Commonwealth v. Wilson, 441 Mass. 390, 396 (2004), citing Terry, 392 U.S. at 29-30.  For the reasons discussed above, the defendant's movements and pressing of his pocket provided reasonable suspicion that the defendant was armed and dangerous.  An officer outnumbered four to one, conducting a nighttime traffic stop, when confronted with behavior such as the defendant's, has reason to conclude that a person is armed and dangerous and can therefore seize the weapon, as the trooper did in this case.[6]  See Karen K., 491 Mass. at 176; Resende, 474 Mass. at 461; DePeiza, 449 Mass. at 371-372.  See also Adams, 407 U.S. at 146 (given safety purpose of limited search permitted by Terry, "frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law"); United States v. Isham, 501 F.2d 989, 991 (6th Cir. 1974) (officers permitted under Terry to seize weapon not obviously contraband from backseat of car to protect officers' safety); People v. Williams, 111 A.D.3d 448, 448 (N.Y. 2013) ("reasonable" for officer to immediately seize pistol "as a safety measure" after lawful stop and frisk).  Cf. Schubert v. Springfield, 589 F.3d 496, 503 (1st Cir. 2009) (seizure of firearm permissible for time necessary to determine whether person was legally permitted to carry firearm after officer observed him walking near court house with handgun partially concealed under his suit jacket). 
            To deny a law enforcement officer properly engaged in a Terry-type stop the ability to seize a firearm from a person who is reasonably suspected of being armed and dangerous unless and until the officer can confirm licensure status would unnecessarily place officers in danger as they perform their public safety responsibilities.  See Terry, 392 U.S. at 34 (Harlan, J., concurring) (once officer is justified in engaging in Terry-type stop to prevent or investigate crime, "the officer's right to take suitable measures for his own safety follow[s] automatically").  Accordingly, Vath, who properly stopped the vehicle for speeding and reasonably believed the defendant to be armed and dangerous, was entitled to protect himself by seizing the defendant's firearm.  See id. at 30-31 (when firearm is discovered during lawful stop and frisk, frisk "is a reasonable search under the Fourth Amendment [to the United States Constitution], and any weapons seized may properly be introduced in evidence against the person from whom they were taken").  See also Adams, 407 U.S. at 148 (loaded gun seized as result of officer's "limited intrusion [of reaching into the defendant's car where firearm was thought to be hidden] designed to insure his safety" admissible at trial).  The motion judge did not err in denying the motion to suppress the firearm based on the circumstances of its seizure.  
            c.  Miranda warnings and unpreserved errors.  Finally, the defendant asks us to review four discrete errors that he claims arose at either his pretrial motion hearing or at trial.
            First, the defendant asserts that his statement to Vath acknowledging he did not have a license to carry was the product of a custodial interrogation, for which the defendant did not receive the requisite Miranda warnings.[7]  He therefore argues that the motion judge erred in denying his pretrial motion to suppress this statement.  The defendant did not fully brief this issue in his pretrial motion to suppress, but he did raise it orally at the pretrial hearing.  Notably, the Commonwealth did not seek to admit the statement at trial.
            Second, the defendant raises three unpreserved trial errors:  (1) the admission in evidence of a spent cartridge and projectile that were not clearly connected to the firearm at issue in the case; (2) statements made during the Commonwealth's closing argument that were purportedly unsupported by the evidence admitted at trial; and (3) the trial judge's jury instructions on the element of possession, in which the judge twice instructed that one possesses whatever is in one's pocket.[8]
            Given that the defendant is entitled to a new trial, it would be premature for us to decide these issues.  Cf. Commonwealth v. Graziano, 371 Mass. 596, 599-600 (1976) (premature to decide four questions involving polygraph testing where "on remand the trial judge may decline to permit the polygraph test or, if such a test is given, may subsequently exclude its results from use at the trial").  Indeed, it may be completely unnecessary to decide such questions, as we do not know if or how they may present themselves at a new trial.  Nevertheless, the defendant asks us to exercise our discretion to address these averred errors because they may recur at retrial.  See Commonwealth v. Cyr, 425 Mass. 89, 95-98 (1997), S.C., 433 Mass. 617 (2001).
            We decline to do so.[9]  See Commonwealth v. Keizer, 377 Mass. 264, 271 (1979); Commonwealth v. Crayton, 93 Mass. App. Ct. 251, 259 (2018).  See also Commonwealth v. Anestal, 463 Mass. 655, 673-674 (2012); Commonwealth v. A.B., 72 Mass. App. Ct. 10, 14 n.6 (2008).  The defendant is, of course, free to raise these issues should they arise at any subsequent retrial.
            3.  Conclusion.  We discern no error in the denial of the defendant's motion for a required finding of not guilty as to the charge of carrying a firearm without a license, G. L. c. 269, § 10 (a), or in the denial of the defendant's pretrial motion to suppress the firearm seized from him during the lawful traffic stop.  In light of our holding in Guardado II, we vacate the conviction and remand the case to the Superior Court for a new trial.                                                     So ordered.     
 
footnotes

 
            [1] As explained in greater detail infra, we do not address the denial of the defendant's pretrial motion to suppress insofar as it concerned the defendant's statement, which was not used as evidence at trial, that he was unlicensed.  
            [2] We acknowledge the amicus brief in support of the defendant submitted by Lorenzo Jones.
            [3] "Lidar," a portmanteau of "light" and "radar," refers to "[a]n optical sensing technology used to determine the position, velocity, or other characteristics of distant objects by analysis of pulsed laser light reflected from their surfaces."  American Heritage Dictionary of the English Language 1013 (5th ed. 2016).
            [4] As to the driver's license, at a pretrial motion hearing in September 2022, Vath testified that the driver provided a New Jersey identification card but no driver's license.  Vath queried a computer database and determined the driver did not possess a license in New Jersey or any State in New England.  The driver also did not provide the vehicle registration and instead produced a "purchase and sales agreement [for the vehicle] that was handwritten on a piece of notebook paper."  The Commonwealth did not, however, elicit this testimony or submit evidence to this effect at trial.
            [5] Although not explicitly laid out in the statutory provisions, New York courts had permitted licensing officials to restrict licensees' public carry to activities including hunting, target shooting, and traveling to and from a place of employment where being armed was a job requirement.  See Bruen, 597 U.S. at 12, citing Matter of O'Brien, 87 N.Y.2d 436, 438-439 (1996), Babernitz v. Police Dep't of New York, 65 A.D.2d 320, 324 (N.Y. 1978), and Matter of O'Connor, 154 Misc. 2d 694, 696-698 (N.Y. County Ct. 1992).
            [6] As noted supra, at the hearing on the defendant's motion to suppress, Vath testified that the defendant verbally confirmed he did not have a license to carry after his firearm was discovered.  Because we need not address the defendant's Miranda argument to resolve this appeal for the reasons discussed infra, we do not consider the statement in our analysis of the defendant's assertion of illegitimacy regarding the seizure.
            [7] Although the defendant's pretrial motion to suppress was ultimately denied, the motion judge made the following relevant finding of fact:
"[I]t was after [removing the firearm from the defendant's pocket and placing him in handcuffs] that the Trooper asked the defendant whether he had a license to carry or a firearms identification card and the answer was no.  And that question occurred without any evidence of the defendant having been given his Miranda rights" (emphasis added).
At trial, however, the Commonwealth did not elicit any testimony or offer any evidence regarding the defendant's response to Vath's question about licensure, and the jury was therefore unaware of it.
            [8] More specifically, in his initial charge to the jury, the trial judge instructed, in part:  "A person, obviously, possesses something if that person has direct physical control or custody of it at a given time.  In that sense, you possess whatever you have in your pocket or in your bag right now."  After the jury sent a note asking to be reinstructed on "the definition of possession and knowing possession," the trial judge again used this example:  "And as I said earlier and I say, again, now, in that sense, you possess something that you have in your pocket"  Because the firearm at issue in this case was found in the defendant's jacket pocket, and Vath testified to this effect at trial, the defendant argues that these jury instructions impermissibly "created a mandatory presumption that the element of possession is met where the facts show that an item is recovered from a person's pocket."
            [9] We note, too, that, at oral argument before this court, the Commonwealth conceded it would not seek to admit the defendant's admission that he did not possess a license to carry or FID card at retrial and that the jury instruction regarding possession would best be illustrated by a different example.